## Henderson et al. v. Foster et al.

(Decided January 24, 1930.)

FLOYD J. LASWELL and SANDIDGE & SANDIDGE for appellants.

LOUIS I. IGLEHEART for appellees.

OPINION OF THE COURT BY DRURY, COMMISSIONER—
Affirming.

Eldon Henderson and Gus Brand, partners as Henderson & Brand, and herein referred to as the drillers, have appealed from a judgment for $1,941.16 recovered against them by C. E. Foster, D. E. Foster, and W. Roy Hogan, herein referred to as the company.

On August 7, 1928, these people made a contract by which the drillers were to drill for the company a well in search of oil. This well was to be drilled to what is known as the Barlow sand, which they expected to reach at a depth of about 1,000 feet. The company was to furnish the casing, the drillers to set same, do all other work, and furnish all machinery, etc. For this work the drillers were to be paid as follows: $2.25 per lineal foot for drilling; $20 for each day or 24 hours for shutdowns caused by failure of the company to make payments as due; $30 for each 12-hours tower, for pulling casing, reaming, and resetting casing if such work should be found necessary.

This word "tower," usually written "tour," in oil well drilling parlance means the same as the word "shift" in mining parlance.

These parties expected to find three formations referred to as "sands;" the "Jett sand" they expected to find between 700 and 800 feet from the surface, the "Jackson sand" at about 975 feet, and the "Barlow sand" at about 25 feet below the Jackson.

W. Roy Hogan, one of the company, was a man of experience in such work and the drillers were told to follow his instructions.

These drillers seem to have gone ahead according to their own ideas and to have sought no instructions. They put in 67 feet of 10-inch casing, inside of that they put

365 feet of 8¼-inch casing, and inside of that they put 720 feet of 6¼-inch casing.

The contract was that the work should be prosecuted actively and continuously (Sundays excepted) until completion. The work began, but, after reaching a depth of about 788 feet, the drillers stopped work, removed the machinery, and sued the company in equity upon the following account, for which they asserted a lien:

| | |
|---|---:|
| Drilling | $1,774.00 |
| 17½ days of shutdown time at $20.00 | 350.00 |
| 5 days of pulling casing at $30.00 | 150.00 |
| Total | $2,274.00 |
| Credited by cash paid drillers | 1,300.00 |
| Balance | $974.00 |

The company denied owing the driller anything, alleged the drillers had breached their contract, and made a counterclaim for damages resulting therefrom as follows:

| | |
|---|---:|
| Cash paid the drillers (the plaintiff) | $1,300.00 |
| Casing furnished | 1,090.65 |
| Loss of leases | 2,609.35 |
| Total | $5,000.00 |

The basis of this counterclaim is thus stated in their pleading: "The plaintiffs, Eldon Henderson and Gus Brand, broke and violated the terms and conditions of said written contract entered into between the plaintiffs and the defendants, in that, the plaintiffs did not prosecute the work of drilling said well actively and continuously until completion and failed to complete said well at all; that the plaintiffs placed in charge of the drilling of said well inexperienced drillers and were themselves inexperienced in the drilling of oil wells, and drilled said well in such a manner that it could not possibly be completed or drilled to the depth necessary to be drilled in order to drill said well through the Barlow sand at a depth of about 1,000 feet in carrying out the plaintiffs' contract with the defendants to complete said oil well; that the plaintiffs negligently and carelessly carried on their operations in drilling said oil well and in doing so did not drill a hole of a sufficient size to a suffi-

cient depth in order to carry on the drilling to and through the Barlow sand, in other words, the defendants state that plaintiffs should have drilled an eight inch hole down to the Jett sand in order to be able to carry on the drilling of the well down through a smaller hole to the Barlow sand; that the manner in which the plaintiffs drilled said hole and the size of the hole prevented plaintiffs from drilling said hole down to and through the Barlow sand; that the plaintiffs, through their negligence and carelessness and inexperience failed to drill said hole in such a manner as to put it down to a depth required to drill through the Barlow sand; that the plaintiffs never completed the drilling of said well as they had contracted so to do and as the result of the failure on the part of the plaintiffs to drill said well the defendants have been greatly damaged by said failure on the part of the plaintiffs to drill said well; that said well is worthless to defendants and was never drilled by plaintiffs according to the terms and conditions of said contract; that plaintiffs on their part failed to drill said well down to and through the Barlow sand.''

By reply, the drillers put the counterclaim in issue and affirmatively alleged the drilling was stopped at the direction of the company on May 5, 1928.

After hearing the proof, the chancellor found the work was not stopped at the direction of the company, and that the drillers had breached their contract. He dismissed the petition of the drillers, and gave the company judgment against them for the following items:

| | |
|---|---:|
| The sum of money actually paid by appellees to contractors | $1,300.00 |
| To expense in hauling casing to the location | 68.50 |
| To expense removing casing from well where contractors left it | 300.00 |
| To depreciation of the casing from use to the extent of 25 per cent. of the cost price in the sum of $1,090.65 | 272.66 |
| Total | $1,941.16 |

The first question is: Did the company direct these drillers to stop work on May 5th. Both of the drillers say that they received such orders from Mr. C. E. Foster,

one of the company. He positively denies that he gave such direction. In the face of such a dispute, we must look for other evidence. The drillers place their reliance on this telegram:

"Dayton Ohio May 8, 1928

"Henderson & Brand Frick & Lindsey Owensboro Ky.

"Have been trying reach Hogan He stated yesterday you were seven eighty six and one foot in brown lime You wire seven ninety dry Cant understand it Believe should make at least thirty feet more See Roy so he can advise Have him wire us here so can instruct you "Foster."

This telegram they argue shows that Foster had stopped the work and later decided to go 30 feet more. It does not so impress us, and especially is that contention weakened when we read the other telegrams in the record. The drillers sent this telegram:

1928 May 10 AM 9

"C. E. Foster Statler Hotel Cleveland Ohio

"Hole Caving Necessary to run small pipe or could try to ream but dangerous owing to cavings If you get pipe we will go on If we ream send the closed down time We are tired of your promises Want action or we will move off Advise what to do— "Henderson & Brand."

That discloses why work was stopped. These drillers were wanting their money, and were threatening to abandon the work if money was not forthcoming. Then this wire was sent the drillers.

"May 10th 1928

"Henderson & Brand. C/ Frick & Lindsay Supply Co. Owensboro Kentucky

"We formally notify you that we look to you for fulfillment your end of contract and hold you responsible for hole would advise that you place hole in shape to rest pipe to brown lime as Hogan originally instructed you

"C. E. Foster and D. E. Foster."

We cannot describe the attitude of these drillers then better than their counsel describes it in brief filed on their behalf. He says:

> "This the appellants refused to do unless their money therefor, as well as the amount due for previous shut down time, etc., was placed in escrow or some satisfactory security or guaranty was given them that they would be paid for their work. The appellees would not, and possibly could not, furnish them such guaranty. Thereafter the appellants moved their machinery from the lease and were forced to institute this suit to recover $974.00 due them for the footage drilled over 600 feet and for the shut down time they lost due to the cold checks and other faults of the appellees."

That explains the situation. Some of this company's checks had not been paid when presented, but were afterwards paid. These drillers were trying to force the company to give some sort of security, but the contract did not provide for security until they reached the "Jackson sand" which was supposed to be about 200 feet further down. No further payments were due until that sand was reached.

That this was their attitude is further shown by this telegram which they sent on May 25th.

> "C. E. Foster—114 Otterbin Ave. Dayton Ohio
>
> "Hole in good shape to underream or set small casing Which do you want to furnish The hole caving so bad we cant do a thing Straight reaming be about twenty feet to underream When Dewey coming down Wire at once for we tired being shut down— "Henderson & Brand."

They were unable to get the company to modify the contract and give security, so the drillers breached it and moved away.

The proof shows this well is in such condition it cannot be completed. It is what oil men term "a ruined hole."

No one is complaining here except the drillers, and can they successfully complain of the measure of damages adopted by the court? We think not. See 40 C. J. p. 1132; Summers on Oil & Gas, sec. 233, p. 694; Law of Oil & Gas, Mills & Williams, secs. 218, 238; Corbin O. & G. Co.

v. Mull, 123 Ky. 763, 97 S. W. 385; Chapman v. Clements, 56 S. W. 646, 22 Ky. Law Rep. 17.

Ordinarily the measure of damages for breach of contract would be the difference between what it would cost the company to complete this well and what they would have had to pay the drillers if they had completed it under the contract. However, this record shows these drillers have got this well into such a condition it cannot be completed. Therefore the company will have to begin anew.

Some one will have to be paid to sink a new well. The company can perhaps use this casing again, but it will have to pull it out of this well, and, when it is out, it will not be so easily used as new casing, and we are not disposed to disturb the finding of the chancellor as to the cost of pulling it, or as to the depreciation in its value on account of having been used.

Whether the item of $68.50 for hauling should have been allowed we need not determine, as it is too small to be of that importance. Kappa v. Brewer, 207 Ky. 61, 268 S. W. 831; Foley's Adm'r v. Robertson's Guardian, 215 Ky. 647, 286 S. W. 851; Nussbaum v. Standard B. P. Co., 216 Ky. 119, 287 S. W. 353.

The judgment is affirmed.