233 F.2d 476
 Julius M. BANKOFF and Max Bankoff, partners doing business under the firm name and style of Bankoff Oil Co., Appellants,
v.
Raymond L. WYCOFF and Richard A. Wycoff, partners doing business under the firm name and style of Wycoff Drilling Co., Appellees.
 No. 5205.
 United States Court of Appeals Tenth Circuit.
 May 4, 1956.
 
 Malcolm Miller, Wichita, Kan. (George B. Powers, Carl T. Smith, John F. Eberhardt, Stuart R. Carter, Robert C. Foulston, Robert N. Partridge, and Robert M. Siefkin, Wichita, Kan., were with him on the brief), for appellants.
 Wayne Coulson, Wichita, Kan. (E. M. Beougher, Grinnell, Kan., and Marvin E. Thompson, Russell, Kan., were with him on the brief), for appellees.
 Before BRATTON, Chief Judge, and HUXMAN and MURRAH, Circuit Judges.
 BRATTON, Chief Judge.
 
 
 1
 This was an action to recover for services rendered in the drilling of a well for oil and gas. Raymond L. Wycoff and Richard A. Wycoff were engaged in the business of drilling oil and gas wells. Julius Bankoff and Max Bankoff were engaged in the business of exploring and developing property for oil and gas, and they acquired through a farmout arrangement a lease covering a tract of land in Sherman County, Kansas. The parties entered into a written contract in which the drillers agreed to drill a well on such land. The contract provided in presently pertinent part that the well should be drilled to a depth of approximately 5300 feet, or approximately 100 to 150 feet into the Mississippi Lime formation; provided that the price paid for the drilling should be $4.00 per foot; provided that in the event heaving shale was encountered in the drilling, operations should be placed on a day work basis until such conditions were overcome and normal drilling operations could be resumed; and provided that the compensation for services on such day work basis should be $600 per day. The well was drilled to the approximate depth of 5214 feet without reaching the Mississippi Lime formation. When it reached that depth drilling difficulties were encountered. Approximately 22 days were spent in an effort to overcome the difficulties. Regarding the difficulties as insurmountable, operations were terminated and the premises were abandoned. Payment for the drilling and for the services rendered on the day work basis was refused and the suit was instituted. By answer the owners pleaded that the drillers breached the contract by terminating operations without completing the well; and by counterclaim, the owners sought to recover for sums expended in reliance upon the drillers completing the contract.
 
 
 2
 Adapting its action to the evidence adduced, the court submitted the cause to the jury on two alternative theories. The first theory was that the drilling operations were discontinued as the result of an oral agreement between the parties. And the second theory was that in the drilling of the well, heaving shale was encountered; that the owners refused to recognize such fact with an obligation upon them to pay on the day work basis for services rendered in an effort to overcome the difficulty; and that such refusal constituted an anticipatory breach of the contract. The manner in which the cause was submitted, and the verdict in favor of the drillers, considered together, make it clear that the verdict was predicated upon a finding that the drilling operations were discontinued and the premises abandoned as the result of an oral agreement between the parties. Judgment was entered upon the verdict; and the owners appealed.
 
 
 3
 The judgment is challenged upon the ground that the drillers breached the contract by failing to drill the well to the specified depth and therefore they were not entitled to recover for the services rendered. The agreement into which the parties entered was a completion contract. Under its terms and provisions, the drillers were obligated to drill the well to a certain depth for which they were to be paid on completion at the rate of a specified sum per lineal foot and at a certain rate for services rendered on a day work basis. And it is the general rule that under a contract of that kind, recovery cannot be had for services rendered unless and until the well is completed by the drilling of it to the specified depth. Carpenter v. Josey Oil Co., 8 Cir., 26 F.2d 442; Sun Oil Co. v. Union Drilling & Petroleum Co., 208 Cal. 114, 280 P. 535; Fessman v. Barnes, Tex.Civ.App., 108 S.W. 170; Henderson v. Foster, 232 Ky. 519, 23 S.W.2d 917; Green Machinery Co. v. Green, Tex.Civ.App., 266 S.W.2d 279. But ordinarily parties are free to alter, modify, abrogate, or rescind their contract. And in the absence of a constitutitional or statutory provision otherwise, it is not essential that mutual assent to alter, modify, abrogate, or rescind be express. It may be implied from acts and circumstances. Ely v. Jones, 101 Kan. 572, 168 P. 1102; State ex rel. Parker v. Board of Education of City of Topeka, 155 Kan. 754, 129 P.2d 265; Beard v. Achenbach Memorial Hospital Association, 10 Cir., 170 F.2d 859.
 
 
 4
 Jurisdiction of the court below was invoked and exerted on the ground of diversity of citizenship with the requisite amount in controversy and therefore the crucial question whether under the facts as found by the jury the owners were liable to the drillers for the services rendered must be determined by the law of Kansas. Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188.
 
 
 5
 Evidence and countervailing evidence was adduced relating to the issue whether due to insurmountable difficulties encountered in the course of drilling operations, drilling was terminated and the hole abandoned by mutual consent of the parties and the jury resolved the issue in favor of the drillers. In Meyers v. Zahn, 136 Kan. 49, 12 P.2d 727, the owner and the driller entered into a completion contract for the drilling of a gas well to the depth of 700 feet unless oil or gas was found in commercial quantities at a lesser depth. The driller was to be paid the sum of $1.25 per foot for such drilling. Drilling was discontinued at a depth of 500 feet and the driller sought to recover for the services rendered. There was evidence that the owner stopped the drilling and that the driller acquiesced therein. And there was countervailing evidence that the owner demanded completion of the well but the driller refused to complete it. That issue of fact was submitted to the jury. A verdict was returned for the driller which manifestly rested upon a finding that the owner stopped the drilling and the driller acquiesced therein. And liability of the owner for the drilling at the contract price was upheld. It is true that there the driller contended that the owner stopped the drilling and that the driller acquiesced therein, while here the drillers contended — and the jury found — that the drilling operations were discontinued by mutual agreement of the parties. But in a case of this kind, there is no decisive difference or distinction in law between unilateral termination of drilling operations by the owner with the acquiescence of the driller and termination by mutual consent of both parties. Unilateral action on the part of one party to a contract with the acquiescence of the other party is the equivalent of action by mutual agreement of both parties. It seems clear that under the law of Kansas when drilling operations were terminated and the hole abandoned pursuant to the mutual agreement of the parties, the owners became and were liable to the drillers for the footage drilled at the rate fixed in the contract. Meyers v. Zahn, supra.
 
 
 6
 The owners advance the contention that even though it be assumed that there was a mutual agreement between the parties that drilling operations be ended and the hole abandoned, still the drillers were not entitled to recover for the reason that such agreement was without consideration. An agreement with no benefit or detriment to either party is infirm for want of consideration. Robberson Steel Co. v. Harrell, 10 Cir., 177 F.2d 12. But the agreement which the jury found that these parties entered into was not burdened with that weakness. Under its terms, the drillers surrendered the right to do additional drilling and be paid therefor. The owners gave up the right to have the hole drilled to the contract depth and were relieved of the obligation to pay for the additional drilling necessary to complete the well to the specified depth. And the owners were relieved of the further obligation to furnish the drilling mud necessary for use in connection with the additional drilling. The relinquishment of these respective rights, and the gaining of these respective benefits, constituted sufficient consideration to support the agreement. Ely v. Jones, supra; Dickinson v. Lawrence Lodge No. 4, etc., 135 Kan. 87, 9 P.2d 985.
 
 
 7
 Finally, the judgment is challenged on the ground that reversible error was committed in permitting the drillers in the course of their cross-examination of the witness Julius M. Bankoff to establish the fact that Aurora Gasoline Company assigned certain leases and paid certain cash to the Bankoffs. The argument is that the evidence related to a matter not material to the issues in the case and was prejudicial. Julius M. Bankoff was introduced as a witness for the owners. In the course of his direct examination he testified that the owners acquired from Aurora Gasoline Company through a farmout agreement the leasehold estate upon which the test well was drilled. He identified the farmout agreement and it was thereupon introduced in evidence. The agreement obligated Bankoff Oil Company to begin a test well on the premises on or before a certain date, to prosecute the drilling diligently and in a good workmanlike manner, to drill the well to a depth sufficient to penetrate 150 feet into the Mississippi Lime formation which should be found at the approximate depth of 5300 feet, and to complete the well on or before a specified date. The agreement provided that upon the completion of the well, drilled to a depth sufficient to penetrate the Mississippi Lime formation, Aurora Gasoline Company should assign to Bankoff Oil Company certain mineral leases; and it further provided that upon the submission of evidence that the well had been completed and abandoned as a dry hole, Aurora Gasoline Company should pay to Bankoff Oil Company the sum of $1.50 per lineal foot for the total depth drilled. Replying to questions propounded on cross examination, the witness admitted that some of the leases had been assigned and $3910 had been paid to Bankoff Oil Company. Under the terms of the farmout agreement, the obligation of Aurora Gasoline Company to assign the leases or to make payment of the dryhole contribution did not arise until the test well had been completed. And the right of Bankoff Oil Company to the leases or the dryhole money did not mature until the well had been completed, either as a producer or a dry hole. In the circumstances, receipt of assignments of part of the leases, and receipt of approximately one half of the specified dryhole contribution, was a circumstance tending to throw light upon the question whether the Bankoffs treated the well as a completed test of the acreage and agreed to the termination of the drilling operations and the abandonment of the premises. And the testimony establishing such circumstances was admissible. Cf. Finch v. Pulaski Oil Co., 110 Okl. 270, 237 P. 599.
 
 
 8
 The judgment is affirmed.
 
 
 9
 HUXMAN, Circuit Judge (dissenting).
 
 
 10
 Under the written contract the driller was entitled to no compensation until he completed the well. He encountered difficulties which made further drilling impossible. His expert had advised him to abandon the hole. He had been drilling twenty-two days without making any progress. He had twisted off what is described in drilling parlance as a fish. Being unable to get this out or drill through it, he had started to drill around it when he twisted off a second fish. It was after he was unable to get by this fish that he was advised to abandon the hole. He then called the owner over long distance telephone. The telephone conversation initiated by him is the sole and only evidence remotely bearing on the question whether the written contract was modified by an oral agreement. Here is the conversation. The driller said: "I told him that I had some more bad news for him; that we had twisted off a second fish by the first fish, and the fishing company was advising us to abandon the hole. And he said, `Well, that is bad news.' He said, `Looks like that is it.' He said, — I said, `Well, I would like to move off.' And he said, `You may as well move off; and call me the first of the week; when you get moved off, call me, and we will arrange for a meeting to discuss the matter.'" Standing alone, the owner's statement, "call me the first of the week; when you get moved off, call me, and we will arrange for a meeting to discuss the matter" might be construed to mean that the purpose of such a meeting was perhaps to discuss payment for what drilling had been done or a modification of the written contract. But that would not constitute a modification. It would only mean that the parties intended to have a conference for the purpose of effecting a modification. No such conference was ever held. However, it is clear from the undisputed evidence that the purpose of this meeting was not to consider payment for what had been done. Such an inference is negatived by the driller's answer to the following question put to him. "Q. Now in this conversation didn't Mr. Bankoff advise you, and didn't he always advise you, that you had a contract, that he would abide by the contract; the only difference that you had was whether or not the material which you reported as heaving shale was heaving shale?" "A. I believe that is right. I would say yes." From the driller's own testimony it is clear that Bankoff never consented to a modification of the written contract. The subject which the parties were to discuss in the meeting which never took place is clearly shown by the following questions and answers put to Wycoff: "Q. Didn't you discuss in the telephone conversation immediately after sending these telegrams, along the next day, the possibility that if you couldn't get all those tools out, of just getting over and drilling another well, because Mr. Bankoff had to have one completed by August 5th to meet the conditions in his farm-out?" "A. It was discussed."
 
 
 11
 Wycoff's own uncontradicted testimony thus in my view irrefutably establishes that in the very conversation upon which he relies to establish the abandonment and modification of the written contract he was advised, as he always had been, that the owner stood upon the written contract.
 
 
 12
 This is not a case such as Meyers v. Zahn, 136 Kan. 49, 12 P.2d 727, relied upon by the majority, where there was a clear conflict in the evidence. Here we take only the evidence as given by the driller. The owner's response to the driller's statements in the phone conversation amounted to no more than a concurrence in the driller's determination to quit drilling. Had the owner objected to discontinuance of further drilling operations, which he could not do under the contract, the result would have been the same — drilling operations would have been stopped because the driller could not go on. In my view the trial court erred in submitting the case to the jury. I would reverse with directions to dismiss.