SIOUX CITY AND NEW ORLEANS BARGE LINES, INC., a corporation, Libelant,

v.

W. D. BRUNSON, doing business as Brunson's Construction Company, Respondent.

STAUFFER CHEMICAL COMPANY, Libelant,

v.

BARGE SC AND N.O. 1515, Sioux City and New Orleans Barge Lines, Inc., a corporation, owner of the said Barge SC and N.O. 1515, and W. D. Brunson, doing business as Brunson Construction Company, Respondents.

Nos. 2786, 2884.

United States District Court
S. D. Alabama, S. D.
June 30, 1965.

Edwin J. Curran, Jr., of Vickers, Riis, Murray & Curran, Mobile, Ala., for libelant Sioux City & New Orleans Barge Lines, Inc.

George F. Wood, of Pillans, Reams, Tappan, Wood & Roberts, Mobile, Ala., for libelant Stauffer Chemical Co.

Alexander F. Lankford, III, of Hand, Arendall, Bedsole, Greaves & Johnston, Mobile, Ala., for respondent Brunson.

DANIEL HOLCOMBE THOMAS, District Judge.

These consolidated cases arise out of the sinking of the Barge SC & N.O. 1515, hereinafter referred to as the 1515, at the dock of Stauffer Chemical Company's plant at LeMoyne, Alabama, during the night of November 24, 1958, or the early morning hours of November 25. The 1515 is, and was at that time, owned by Sioux City & New Orleans Barge Lines, Inc., hereinafter referred to as Sioux City. At the time of the sinking the 1515 was partially loaded with approximately 839 tons of crude sulfur which was the property of Stauffer Chemical Company, hereinafter referred to as Stauffer.

W. D. Brunson, doing business as Brunson's Construction Company, hereinafter referred to as Brunson, had a contract with Stauffer for the discharging of sulfur from barges which were to be spotted at Stauffer's dock by Sioux City, and removing it to the Stauffer plant, approximately one and a half miles from the dock. Stauffer seeks to recover from Brunson damages done to the crude sulfur which remained in the 1515 at the time of the sinking. Sioux City seeks to recover from Brunson the damages to the 1515 occasioned by the sinking.

## FINDINGS OF FACT

Stauffer owns and operates a plant at LeMoyne, Alabama, which uses crude sulfur as a basic raw material in its manufacturing process. This crude sulfur, in bulk form, is transported from Port Sulfur, Louisiana, to Stauffer's dock at LeMoyne in covered hopper type barges by Sioux City, pursuant to a written contract.

A written contract was entered into between Stauffer and Brunson on the 1st of October, 1957, whereby Brunson was to discharge all sulfur barges at Stauffer's dock. The contract provided, among other things, that Brunson would provide such equipment as was necessary to completely discharge a barge of sulfur within twenty-four hours after it was moored at Stauffer's dock, Saturdays, Sundays, holidays and weather not excepted. It also provided that Brunson would have sole and exclusive care, custody and control of the sulfur from the time the barges were moored at the dock until it was delivered and accepted at the plant; and that Brunson would assume full responsibility for any and all damage to the sulfur occurring while in his custody or possession. Brunson also thereby assumed responsibility for any damage done to barges in the process of unloading.

Stauffer was to furnish a safe berth and wharf or pier for the barges, and was to notify Brunson as to the date of any shipment of sulfur.

Stauffer's dock facilities consisted of a wooden pier or platform extending slightly out over the river. This pier was narrow and necessitated the leaving of Brunson's crane in one position during the entire unloading operation. From this one position it was impossible to completely unload a barge without the barge being shifted. A system was devised whereby Sioux City would bring in two barges, the first barge would be tied off to piling clusters upstream from the pier, the second being placed in tandem with its stern adjacent to the pier. Brunson would commence discharging the second barge from the stern, completely discharging the sulfur as he moved forward with the clamshell. At such point as the clamshell could not reach any more sulfur, the lines on the barge would be loosened, allowing the barge to slip downstream under the force of the river cur-

rent, to a point where more sulfur could be removed.

When the barge was completely discharged Brunson would notify Stauffer, who in turn would secure the services of a tug to shift the barges, moving the upstream full barge to an unloading position and moving the empty barge away from the pier.

It was impossible to remove all the sulfur from a barge with a clamshell. So, even though Brunson was to provide all equipment necessary to completely unload a barge under the contract, Stauffer maintained and furnished to Brunson, a payloader along with brooms to clean out the barges. Stauffer was interested in recovering all the sulfur since title had vested in them at the point of loading. Stauffer also furnished tarps to cover the sulfur on the dump trucks of Brunson to avoid any waste between the dock and plant.

Though the contract between Stauffer and Brunson provided that a barge would be completely unloaded within twenty-four hours after mooring, this was never accomplished. Under the prevailing working conditions a barge could be approximately one-half discharged during daylight hours. Night operations were attempted at the very beginning of the contract and found to be impossible due to the lack of illumination in the area. The lack of lights at the dock created too great a hazard to the safety of both the men and equipment.

So, during the life of the contract, except for the initial trial, Brunson discharged only during daylight hours. At the end of each day a check of the barge would be made to see that it was secured and that everything was in order.

During the hours of darkness the barges were unattended, so far as Brunson's men were involved. Brunson and his foreman, Robinson, stated that near the beginning of the contract Mr. Gordon Mitchell, plant manager for Stauffer, told them that someone from Stauffer would check the barges at night. Mitchell denied this, stating that no one from Stauffer was assigned to check the barges at night. Other personnel of Stauffer stated they had made visits to the dock at night. Mr. Allen, superintendent of operations for Stauffer, stated that the foreman (Stauffer's) would, from time to time, go to the dock and casually inspect the barge and area.

Certain events indicate that Stauffer personnel did go to the dock area and check the barges during the hours of darkness and at other times when Brunson's men would not be present. On one occasion someone from Stauffer found a fire in one of the sulfur cargoes and extinguished it. Again a fire was found near a barge and extinguished. On another occasion someone from Stauffer discovered a leak in a barge, placed a pump aboard and called Brunson.

The 1515 is a covered hopper type barge made of steel, 200' long, 40' wide, and 11' deep. It was built in 1954, being four years old at the time of the sinking.

In early November, 1958, Mr. Drum, Sioux City's Port Engineer, inspected the 1515 in New Orleans, and according to him there was no fracture in the forward rake at that time.

Captain Battiste, captain of the Tug GH, which belonged to Nebel Towing Company, Sioux City's subcontractor, stated that on sounding of each compartment of the 1515 before loading for the trip to Stauffer's in November, 1958, he found nothing wrong.

The log of the Tug GH shows that the 1515 and the Barge 1504 were loaded at Port Sulfur, Louisiana, on November 19, 1958. The Tug GH left Port Sulfur at approximately 6:15 p.m., the 19th.

On the 20th of November, the Tug GH tied off the 1515 and the 1504 at the Industrial Willows between 7:00 a. m. and 7:15 a. m. The Tug GH left the area and went to Cliff's Landing to pick up another barge, returning to the Industrial Willows at 2:00 p. m. She left again at 2:15 p. m., the 1515 and 1504 still tied off, and went to Point Landing to pick up another barge. She arrived back at the Industrial Willows at 8:45

p. m. So, for some thirteen and one-half hours, less some fifteen minutes, the 1515 and 1504 were tied off, and as far as the evidence shows, unattended.

During the trip to Mobile, according to Capt. Battiste, the 1515 and the 1504 were made up stern-to-stern, forming one side of the tow, with the other two barges forming the other side, the entire tow being pushed. The flotilla arrived in Mobile on the 22nd of November, and the entire tow was left at the Federal Barge Fleet that night. The next morning, the 23rd, the Tug GH picked up the 1515 and the 1504, proceeded up Mobile River to Stauffer's dock at LeMoyne, broke up the tow and spotted the barges at approximately 10:00 a. m. According to Capt. Battiste no unusual events occurred during the trip.

In a fully loaded condition the 1515 has approximately 2½ feet of freeboard at the stern and approximately 4½ feet at the top of the headlog at the bow, which of course included 1½ feet of deadrise.

On the morning of the 24th, Brunson's men commenced to discharge the 1515, this being the barge which Sioux City had spotted against the pier. The 1504 was tied off to the piling clusters upstream from the pier. Upon arrival that morning Brunson's men found that there was approximately eight feet between the stern of the 1504 and the bow of the 1515. At no time during the day was the 1504 moved, and at no time was the 1515 moved upstream toward the 1504.

At the end of work on the 24th, approximately 661 tons of sulfur had been discharged from the 1515. Robinson, Brunson's foreman, testified that before leaving the area that evening he checked the 1515 to be sure that it was secure, and made a visual inspection of the 1515 to make sure that everything was in order for leaving the barge for the night. He did not look into the forward rake tank. To Robinson the 1515 appeared to be sitting normally in the water, like some 75 to 100 other like barges had looked in a partially discharged condition. There was approximately five to seven feet of freeboard aft and two to three feet freeboard forward, from the top surface of the headlog to the water line, when Brunson's crew left for the day.

In the early morning hours of the 25th of November, Mr. Huddles, of Stauffer, found the 1515 partially submerged by the head, the aft portion being out of the water. Some of the sulfur remaining in the 1515 was subsequently removed and she was raised some several days later.

On raising, it was discovered that there was a fracture in the forward rake knuckle, starboard side, which was the offshore side. The fracture was approximately 1¾ inches wide and 10 to 11 inches long. The fracture was located approximately 2 feet aft of the headlog and approximately 3 feet below the deck level. Buster Miller, the diver who aided in raising the 1515, stated there was a definite oval-shaped indentation at the fracture. He further stated that there was no object on the river bottom which could have caused such split. The fracture had not rusted, indicating a relatively fresh fracture. The salvage equipment could not have caused the fracture.

Mr. Edgar Brantley, marine surveyor for Stauffer's cargo underwriters, testified that he found a scuff mark on the starboard side of the aft rake of the 1504, the upstream barge. The scuff was approximately twelve inches from the stern of the 1504 and appeared to be the result of some heavy metal object having been dragged across it. It appeared to have been done within two weeks from the date it was observed by Mr. Brantley, which was December 2, 1958.

Mr. Brantley testified, and so stated in his survey report, that Mr. Gordon Mitchell (Stauffer plant manager) had told him that during the discharge of the barge the rake end of the 1515 rested on the stern of the 1504 and that the two barges had to be pried apart.

## CONCLUSIONS OF LAW

The subject matter of this cause is within the admiralty and maritime ju-

risdiction of the Court. 28 U.S.C.A. § 1333.

■ . The Court finds that the Respondent, W. D. Brunson, was not guilty of any negligence in the unloading or handling of the 1515.

This leaves as the sole issue whether Brunson is liable to Stauffer under the contract.

The contract clearly sets out the duties, obligations and liabilities of both parties. The problem, however, arises in deciding the performance, waiver, or non-performance of the contract.

Section I, titled Services; section IV, titled Responsibility; and section VII, titled No Waiver, are the most pertinent sections of the contract to this case. The liability, if any, of Brunson, turns on the interpretation of these sections and the actions of both parties as they relate to these sections.

The contract, in section I, sets out nine specific services that Brunson was to perform. The evidence is undisputed that several of these specifics were waived by Stauffer. The most prominent waiver by Stauffer was of section I(b) which required Brunson to furnish all equipment and unload the barges within twenty-four hours. Stauffer in fact furnished the payloaders, pumps, brooms, and tarps.

■■ Parties are free to alter, modify, abrogate, waive, or rescind their contract. It is not essential that mutual assent to alter, modify, abrogate, waive, or rescind, be express. It may be implied from acts and circumstances. Bankoff v. Wycoff, 10 Cir., 233 F.2d 476; United States for Use of Gillioz v. John Kerns Const. Co., 8 Cir., 140 F.2d 792.

■ Although the evidence is in dispute as to who had custody and control of the barges at night, the Court finds that if not expressly, certainly by its actions, Stauffer assumed control over the barges during the hours of darkness.

■ Where a party assumes a duty, although he is not bound to do so, he becomes responsible for his acts, regardless of the contract. Hastorf Contracting

Co. v. Ocean Transportation Corporation, D.C., 4 F.2d 583.

■■ The construction of a contract which the parties have given it while operating thereunder, should be followed. Franklin Fire Ins. Co. v. Chesapeake & Ohio Ry. Co., 6 Cir., 140 F.2d 898. When parties by their uniform conduct over a period of time have given a contract a particular construction, such construction will be adopted by the Courts. Pekar v. Local Union No. 181, Int. U. of United Brewery, etc., 6 Cir., 311 F.2d 628.

■ Expressions in contracts are not conclusive of relationships that arise between parties as a result of the method of transacting business actually conducted between them. Courts will ignore language of a contract which is at variance with the conduct of the parties pretending to act under the contract. Colorado Milling & Elevator Co. v. Glenn, D.C., 118 F.Supp. 943.

Stauffer by its actions and conduct relieved Brunson of his contractual duty to keep a watch over the barges twenty-four hours a day. By relieving Brunson of the above duty, Stauffer also relieved Brunson of responsibility for the barges under section IV, except, of course, for the daylight hours when Brunson was actually unloading the barges.

Stauffer cannot now be heard to say, "We didn't intend to take custody and control of the barges at night." The conduct of Stauffer shows that it did actually assume control. Stauffer's dock facilities were completely inadequate, as to lighting and basic dock equipment, to unload the barges twenty-four hours a day.

As to the Non-Waiver provision in section VII, the case of Helsby v. St. Paul Hospital & Casualty Company, D.C., 195 F.Supp. 385, states:

> "The parties to a contract always have the right to modify their agreement or abrogate it entirely and make a new one. They may do so by any appropriate means notwithstanding self-imposed restrictions in the original instrument."

The case of Universal C.I.T. Credit Corporation v. Stewart, 262 F.2d 745, quotes the general rule "that parties having power to make a contract have the power to modify it regardless of self-imposed limitations."

Stauffer waived the parts of the contract that would have made Brunson liable for the sinking of the 1515.

In Admiralty No. 2786, the Court finds that the Libelant should recover nothing from the Respondent.

In Admiralty No. 2884, the Court finds that the Libelant should recover nothing from the Respondent.

Decree to be entered accordingly.