256 N.J. Super. 143 (1992)
606 A.2d 843
COUNTY OF GLOUCESTER, PLAINTIFF-APPELLANT,
v.
THE STATE OF NEW JERSEY, THE GOVERNOR OF THE STATE OF NEW JERSEY, THE COMMISSIONER OF THE NEW JERSEY DEPARTMENT OF CORRECTIONS AND THE LEGISLATURE OF THE STATE OF NEW JERSEY, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued March 18, 1992.
Decided April 29, 1992.
*144 Before Judges KING, DREIER, and GRUCCIO.
Eugene P. Chell argued the cause for appellant (Eugene P. Chell, on the brief).
Patricia T. Leuzzi, Deputy Attorney General argued the cause for the cause for respondents (Robert J. Del Tufo, Attorney General, attorney; Patricia T. Leuzzi, on the letter brief).
W. Randall Bush, Assistant County Counsel, Morris County argued the cause amicus curiae (W. Randall Bush, on the brief).
The opinion of the court was delivered by DREIER, J.A.D.
*145 The County of Gloucester here seeks to compel the Governor of the State of New Jersey and the Commissioner of the New Jersey Department of Corrections to increase the per diem reimbursement rate for State prisoners housed in the Gloucester County Jail. The County of Morris has intervened as amicus curiae, claiming that the same underpayment exists in Morris County, and that the problems of overcrowding and underpayment is pervasive throughout the State. Alternatively, plaintiff contends that the State prisoners in excess of the 20 prisoners that the Gloucester County is contractually bound to house (40 in Morris County), should be removed from the county jail. Originally this action was filed in the Law Division by a complaint in lieu of prerogative writs, but the State successfully moved to transfer this matter to the Appellate Division. The County here pursues both its primary action transferred to the Appellate Division and an appeal from the order of transfer, contending that the matter properly should have been heard in the Law Division so that a more complete record could have been made. We have consolidated these appeals.
In 1981 former Governor Byrne issued Executive Order No. 106 declaring a Statewide emergency due to over-crowded conditions in the correctional institutions of the State, and authorizing the Commissioner of Corrections to house State prisoners in county jails. The early history of the order and its renewals has been thoroughly explored in Worthington v. Fauver, 88 N.J. 183, 440 A.2d 1128 (1982) (upholding the emergency order), and Shapiro v. Fauver, 193 N.J. Super. 237, 473 A.2d 112 (App.Div. 1984), certif. denied sub nom., Shapiro v. Albanese, 97 N.J. 668, 483 A.2d 186 (1984) (where presuming the validity of the emergency orders through 1983, the court, over a strong dissent by Judge Joelson, upheld the appropriateness of the amount of reimbursement established by the Commissioner). Suffice it to say that throughout the administrations of Governor Byrne, Governor Kean and Governor Florio, 16 successive *146 emergency declarations have been entered by Executive Order, culminating in the current Executive Order No. 52 entered January 17, 1992.
The level of reimbursement was raised from $42.95 per prisoner per day to $45 for the 1985 fiscal year. Notwithstanding the County's assertion of escalating costs, there has been no increase in the reimbursement rate in the past seven years. In sworn testimony in a federal action involving Camden County, the Commissioner stated that the average cost for housing State prisoners in 1989 was approximately $63 per inmate. In his letter to this court he estimates the per diem cost at $50 per day, explaining that the discrepancy in the figures stems from the inclusion in the $63 figure of "costs for treatment, education and care programs which are provided at the State level which are not, in many instances, being provided at the county level."[1]
The County contends that whatever the costs may be for housing State prisoners in a State facility, the proper measure of support should be the cost of maintaining the prisoner in the particular county facility. It is the difference between the level of reimbursement and cost of maintaining the prisoners in the county jail that is being borne by the county taxpayers. Furthermore, since each county has a different tax base to defray such costs, the burden is unequally spread among the counties and their taxpayers. The County has been provided with the State's own figures for housing prisoners in the various State facilities during 1990. They vary from a low of $51.46 to a high of $86.32 per prisoner, and average $66.49. The Morris County amicus brief represents that the United States Marshall's Service agreed as of October 1, 1991 to reimburse Morris County for federal prisoners housed in the Morris County Jail at the rate of $65 per day.
*147 There is no question that there is a significant problem of over-crowding in all of the State and county facilities. When Gloucester County built its jail 10 years ago it was designed to hold 104 prisoners. Since then it has been ordered to double-up the prisoners and to convert additional space to housing, raising its capacity to 225 prisoners. It is still over-crowded and the jail population is constantly subject to orders reducing the jail time of offenders because of a lack of space. The County therefore seeks removal of 55 State prisoners. Morris County has similar problems. Its jail is operating at 211% of its capacity, including 101 State prisoners, 61 more than the 40 the County is contractually bound to house. It estimates the actual cost of housing its jail population at $88 per inmate per day, for which it is reimbursed at the $45 rate.
The State urges that there still is an emergency. When the original Executive Order took effect in June 1981, the State Prison system held 7,637 prisoners, including 569 juveniles and 470 prisoners in County facilities. According to the last available statistics for July 1991, the total inmate population had risen to 23,111, including 678 juveniles and 3,430 prisoners held in county facilities. The State intake therefore has risen three-fold over this ten-year period. To accommodate this increase the State has constructed new prisons and has tripled its own capacity, yet its continued reliance on county facilities wherein the number of State prisoners has also tripled, has caused the county jails throughout the State to be operating at an average of 167% of capacity (utilizing March 1990 figures). State prisons, however, operated at 104.97% of their capacity in 1990, and are projected to have operated at 108.6% of their capacity in 1991. The 1991 State Corrections Report recommended additional funding to pay for the cost of State inmates in county jails, since the budget account for this purpose was in a deficit position as of the date of the report. The State cites the State fiscal crisis as a basis for its inability to do more to defray the cost of State prisoners in county jails.
*148 There are three principal points raised by these appeals. First, is the matter properly before us, or should it have been retained in the Law Division for the creation of a more extensive record? Second, is the State authorized to impose the housing of State prisoners upon the counties by the annual promulgation of an emergency order? Third, may this court grant any relief to the counties for the State's underpayment of per diem inmate costs?
We affirm Judge DeSimone's transfer of the matter to this court. Under R. 2:2-3(a)(2) appeals may be taken to this court as of right "to review final decisions or actions of any state administrative agency or officer, and to review the validity of any rule promulgated by such agency or officer...." Such review vests exclusively in the Appellate Division. Pascucci v. Vagott, 71 N.J. 40, 52, 362 A.2d 566 (1976). There is an exception to this rule where an additional record is necessary. Township of Monclair v. Hughey, 222 N.J. Super. 441, 446, 537 A.2d 692 (App.Div. 1987). But as an alternative to our declining jurisdiction in favor of the Law Division or remanding to the Law Division for the creation of an additional record, we may, and in this case did by our order of May 9, 1991, grant a motion to supplement the record. At that time we permitted the County to provide documentation of its claims, and also authorized the Department of Corrections to submit a supplemental statement which was filed shortly thereafter. There is now a sufficient record before us to pass upon the questions presented.
The action of the State in proceeding under successive Executive Orders pursuant to the Disaster Control Act, N.J.S.A.App. A:9-30 et seq., to remedy an ongoing continuing problem is of questionable validity. The Supreme Court traced the history of the Act in Worthington v. Fauver, 88 N.J. at 192-194, 440 A.2d 1128. The term "emergency" both includes the "war emergency" for which the Act was originally intended, (it was enacted during the Second World War), and also includes "disaster," defined as "any unusual incident resulting *149 from natural or unnatural causes which endangers the health, safety or resources of the residents of one or more municipalities of the State, and which is or may become too large in scope or unusual in type to be handled in its entirety by regular municipal operating services." Ibid (quoting N.J.S.A.App. A:933.1(1)(4)). The Supreme Court noted in Worthington v. Fauver that the Act has been employed "to handle a wide variety of crises, including storms, ... energy shortages, ... labor strikes, ... factory explosions, ... and water shortages...." Id. at 195, 440 A.2d 1128. The Court held that the Act could be applied to authorize the Executive Order for housing of State prisoners in county facilities, since the "problem of prison overcrowding in New Jersey has reached dangerous proportions, and that there is a substantial likelihood of a disastrous occurrence in the immediate future." Id. at 197, 440 A.2d 1128 (emphasis added). The Court later stated that "[t]he statutory validity of executive actions pursuant to emergency power will depend on the nature of the emergency and the gravity of the threat to the public." Id. at 201, 440 A.2d 1128. But the Court also stressed the temporary nature of the order:
We are particularly cognizant of the limited time span involved in these orders. The original order was to be in effect for only 90 days. As matters now stand, the order applies only until January 20, 1982. These time limits appropriately limit the exercise of executive power in light of the predictive nature of the emergency.
Since the threat of damage is extensive and the exercise of emergency power rather limited, it can hardly be disputed that the measures authorized by the executive orders are properly tailored to the magnitude of the current emergency.
Id. at 202, 440 A.2d 1128.
In Shapiro v. Fauver, after two years of "emergency" orders, the majority of this court assumed the continued soundness of the then-current Executive Order, and focused solely on the level of reimbursement. It determined that once the Commissioner had taken jurisdiction over the county facilities it was a matter of State discretion how much would be paid to the counties for State inmates. We there stated:

*150 In directing the Commissioner to formulate an "appropriate" program of compensation the Governor evidently chose to leave the entire question of how much the counties should be paid to the expertise of the department of corrections. If it was the Governor's intention that the counties should be fully reimbursed for their actual cost the executive order could readily have said so. Taking into consideration the fact that he did not direct such a result and the further fact that the counties were legally entitled to nothing in compensation for the emergency takeover of their jail facilities except what the Governor chose to allow, we cannot perceive any criterion by which the Commissioner's level of reimbursement could be other than appropriate.
193 N.J. Super. at 240-241, 473 A.2d 112. This court further explained that even if it was mistaken and the level was inappropriate, there was no judicial remedy available. Id. at 241, 473 A.2d 112.
Judge Joelson in his dissent stated that he was "of the opinion that in view of what may now be given the anomalous label of a `permanent emergency,' it would be manifestly unfair and arbitrary to foist upon the counties the entire cost of maintenance of prisoners who normally should be the responsibility of the State." Id. at 242, 473 A.2d 112 (footnote omitted). In footnote 1 to his dissent, he restated his prophetic comment in his earlier dissent to the Appellate Division decision in Worthington v. Fauver, 180 N.J. Super. 368, 382, 434 A.2d 1134 (App.Div. 1981), rejected by the Supreme Court when it reviewed that decision. He had there raised the "distinct possibility that, after testing the judicial waters and obtaining our imprimatur on the constitutionality of his action, the Governor may decide to extend or later renew his Executive Order for another 90-day term and then for another and another, indefinitely." 193 N.J. Super. at 242, n. 1, 473 A.2d 112.
The New Jersey Constitution (1947) provides that property must "be assessed for taxation under general laws and by uniform rules." N.J. Const. of 1947 art. VIII, § 1, para. 1(a). Robinson v. Cahill (I), 62 N.J. 473, 303 A.2d 273 (1973), cert. denied, 414 U.S. 976, 94 S.Ct. 292, 38 L.Ed.2d 219 (1973). The Supreme Court made it clear that a State function may not be delegated to the counties or municipalities where the burden falls unequally upon the taxpayers. Although the operation of *151 a State prison system is not constitutionally imposed upon the State, as is the educational system appraised in Robinson v. Cahill, the State has assumed this function by statute. In fact, one of the principal departments of the Executive Branch of State government is the Department of Corrections N.J.S.A. 30:1B-1 et seq. The State certainly has the power to act by statute either to absorb the county jails into the State system or to require that county jails house State prisoners, with the State bearing the cost of their maintenance. As the Supreme Court stated in Robinson v. Cahill:
[T]he tax clause was not intended to say that a State function may not be delegated to local government to be met by local taxation. As we noted in Point I, local government is simply an arm of the State with respect to many State functions which the State decides shall be performed through local government. The tax clause does not restrict the State with respect to that decision. Rather it means that if the State decides to handle a service at the State level and to do so on the basis of a property tax, it must tax all taxable property in the State rather than only property in a part of the State; and that if the responsibility for the State function is assigned to local government, the local tax must fall uniformly upon all taxable property within the county or the municipality as the case may be.

62 N.J. at 502-503, 303 A.2d 273 (emphasis added).
Of course, under Worthington v. Fauver, if a true "emergency" exists the Governor may authorize the temporary takeover of county jail facilities by the Department of Corrections, with "appropriate" reimbursement. But as we noted earlier, the "emergency" as defined in the Disaster Control Act, including the temporary problem of overcrowding, may well not include a permanent or semi-permanent condition. This definition does not imply a vehicle to circumvent the general plan of the State's statutes governing the county and State correction systems over such an extended period of time.
Judge Joelson's fear of the Executive Order becoming a permanent fixture, stated as a possibility in his dissent to Worthington v. Fauver, and reiterated as a strong suspicion in his dissent in Shapiro v. Fauver, now stands before us as a reality. As the parade of annual Executive Orders passes before us, it is our function to state that "the emperor has no *152 clothes;" there is no "emergency." There is, rather, an ongoing condition that must be recognized by the State. County jails are bursting at their seams, partially because the State has not absorbed the prisoners who properly belong in State facilities. The State, by reason of its fiscal crisis or otherwise, has chosen to decrease the State's overall cost of corrections by forcing the counties to bear not only the physical overcrowding and its concomitant risk of violence, but also excessive and varying tax burdens caused by inadequate reimbursement. When the authority to do so through emergency action fails, it is incumbent upon the State to correct this situation.
Notwithstanding our recognition of this problem, we cannot and should not direct the State concerning how it should meet its obligations. Putting to one side the question of adequate reimbursement, which has the constitutional overtones noted earlier in the analogy we drew to the school funding case of Robinson v. Cahill, both the Legislature and the Governor are free to regulate the correction system according to law, without direction from the courts. Our function is to point out when legal authorization has been exceeded, not to direct what is essentially a legislative or executive remedy. Prisoners could be administratively absorbed in the State system; the county jails could be placed legislatively under the jurisdiction of the Commissioner; agreement could be negotiated for full reimbursement; or any other appropriate remedial action could be devised and implemented.
We also realize that the action of this court cannot be expected to cause an immediate change in a complex and expensive system of county and State correctional facilities. Some considerable period of time for compliance must be given. Although we note that the initial Executive Order was for a mere 90 days, all of the recent orders have been for a period of one year. We therefore make our decision declaring that the State may no longer rely upon the ongoing overcrowded conditions in the State prisons as an "emergency" under the Disaster *153 Control Act, effective as of one year from the date of this decision.
We next turn to the question of the amount of reimbursement. As we noted earlier, this court in Shapiro v. Fauver determined that while the Commissioner had jurisdiction over the county jails, the reimbursement was a discretionary matter, since "the counties were legally entitled to nothing in compensation for the emergency takeover of their jail facilities except what the Governor chose to allow...." 193 N.J. Super. at 241, 473 A.2d 112. As Judge Joelson noted, however, each of the Executive Orders mandated "an appropriate compensation program for the counties." Since the foundation of Shapiro v. Fauver was the continued effectiveness of the emergency declaration, and as of one year from the date of this opinion that foundation will have crumbled, bringing down with it the authority to pay the counties less than their actual out-of-pocket costs for maintaining the State prisoners.
Again, we have no authority to direct an appropriation to pay any sums that may be due the county. We merely can declare that there is a legal duty to make such payment. The power and authority to appropriate funds is vested in the Legislative branch of government. N.J. Const. of 1947 art. VIII, § 2, para. 2; Karcher v. Kean, 97 N.J. 483, 489, 479 A.2d 403 (1984). The "ultimate legislative authority over appropriations is subject to checks and balances from the executive." Ibid. We must remain outside this process because "[w]ith the ultimate constitutional responsibility for appropriations vested in the Legislature, and with executive responsibilities so clearly involved in the budget process, the judiciary has accepted its own absence of authority to compel either the Legislature to make a specific appropriation or the Governor to recommend or approve one." Id. at 490, 479 A.2d 403 (citations omitted); see also City of Camden v. Byrne, 82 N.J. 133, 149, 411 A.2d 462 (1980). While we may declare these rights, we do not wish to imply any judicial redress to overcome the Legislature's action or refusal *154 to act pursuant to its constitutional power over State appropriations. City of Camden v. Byrne, 82 N.J. at 149, 411 A.2d 462.
We also by no means wish to imply that we adopt the counties' cost estimates. For instance, when Morris County urges that the Federal Marshall's computation which calculates prisoner per diem costs as the total jail budget divided by the total prisoner days, we note that such a simplistic approach does not provide a marginal economic analysis. Certainly, the addition of a single State prisoner would not require any fixed cost adjustment if there is bed space available for that prisoner. The cost of heating would remain the same, the warden would receive the same salary, and most probably no additional personnel would be necessary. As the number of State prisoners increases, expenses not immediately associated with an individual prisoner's care (food, clothing, bedding and the like) begin to appear incrementally. Additional guards, recreational equipment, staff services or even coordinate programs necessary to supervise displaced county jail inmates would have to be reassessed.
The State's present figure of $45 per day per prisoner might be too low, adequate, or even excessive. When the State adds prisoners to a county jail, it does not become necessarily responsible for a percentage of all jail expenses based upon a per capita prisoner ratio. The State may become responsible solely for the extra expenses foisted upon that county to house and provide services to the State prisoner. If the eventual solution to the county-State correction problem is legislatively or administratively resolved by the payment of the county's actual expenses, the State should be liable for no more than the actual costs it has imposed upon each county.
The relief sought by plaintiff is denied. This matter is remanded to the Commissioner of Corrections for such future actions as may be necessary in conformity with this opinion.
NOTES
[1] Our cases abound with claims by prisoners that their enforced retention in County jails deprives them of work credits, recreation, psychiatric services, job training and other rehabilitation opportunities, and the like.