623 A.2d 763

COUNTY OF GLOUCESTER, PLAINTIFF–RESPONDENT, v. STATE OF NEW JERSEY, THE GOVERNOR OF THE STATE OF NEW JERSEY, THE COMMISSIONER OF NEW JERSEY DEPART-MENT OF CORRECTIONS AND THE LEGISLATURE OF THE STATE OF NEW JERSEY, DEFENDANTS–APPELLANTS.

Argued February 2, 1993—Decided April 22, 1993.

*Mary C. Jacobson,* Deputy Attorney General, argued the cause for appellants (*Robert J. Del Tufo,* Attorney General of New Jersey, attorney; *Edward J. Dauber,* Executive Assistant Attorney General, of counsel; *Ms. Jacobson* and *Catherine M. Brown,* Deputy Attorney General, on the briefs).

*Eugene P. Chell* argued the cause for respondent.

*Ronald Kevitz,* First Assistant County Counsel, argued the cause for *amicus curiae* County of Morris (*Howard F. Appelt, II,* Morris County Counsel, attorney).

*Isabel McGinty,* Deputy Public Defender, argued the cause for *amicus curiae* Public Defender (*Zulima V. Farber,* Public Defender, attorney).

The opinion of the Court was delivered by

CLIFFORD, Justice.

We granted certification, 130 *N.J.* 398, 614 *A.*2d 620 (1992), to determine whether current prison overcrowding constitutes an "emergency" within the meaning of the Disaster Control Act, *N.J.S.A.* App.A:9–30 to –63. Because the Appellate Division concluded that an "emergency" as contemplated by that Act no longer existed, it invalidated the then-existing Executive Order (No. 52), which had authorized the housing of State prisoners in county jails. 256 *N.J.Super.* 143, 152–53, 606 *A.*2d 843 (1992). The Appellate Division directed that its decision become effective one year from April 29, 1992, the date of its decision.

We modify the judgment below only to the extent that this Court's judgment will become effective one year from the date of this decision. As modified, the judgment is affirmed.

I

On May 29, 1990, Gloucester County filed a complaint in lieu of prerogative writs, seeking to compel the Governor of the State of New Jersey and the Commissioner of the New Jersey Department of Corrections to increase the per diem reimbursement rate for State prisoners housed in the Gloucester County jail. The County of Morris, appearing as *amicus curiae,* claimed a similar undercompensation for its housing of State prisoners and contended that in fact the problems of overcrowding and undercompensation exist throughout the state. Gloucester County sought as alternative relief the removal from its county jail of all State prisoners in excess of the twenty prisoners that its contract with the State obligated it to house. Similarly, Morris County applied for an order that would compel removal of all State prisoners in excess of the forty required by its contract.

The trial court granted the State's motion to transfer the matter to the Appellate Division under *Rule* 1:13–4. The Appellate Division recognized the severe and continuing problem of prison overcrowding; nonetheless, the court held that an

"emergency" within the meaning of the Disaster Control Act no longer existed. The court below said:

> [T]he "emergency" as defined in the Disaster Control Act, including the temporary problem of overcrowding, may well not include a permanent or semi-permanent condition. This definition does not imply a vehicle to circumvent the general plan of the State's statutes governing the county and State correction systems over such an extended period of time.
>
> * * * As the parade of annual Executive Orders passes before us, it is our function to state that "the emperor has no clothes;" there is no "emergency." There is, rather, an ongoing condition that must be recognized by the State.
>
> [256 *N.J.Super.* at 151–52, 606 *A.*2d 843.]

The Appellate Division thus invalidated Executive Order No. 52, which had authorized the housing of State prisoners in county jails. *Id.* at 152–53, 606 *A.*2d 843.

Addressing the question of reimbursement, the court held that pursuant to *Shapiro v. Fauver*, 193 *N.J.Super.* 237, 473 *A.*2d 112 (App.Div.), *certif. denied sub nom. Shapiro v. Albanese*, 97 *N.J.* 668, 483 *A.*2d 186 (1984), the Commissioner could exercise his discretion in setting the per diem rate of compensation during the life of the Executive Order. 256 *N.J.Super.* at 153, 606 *A.*2d 843. However, the court determined that once the Executive Order and the power to house State prisoners in county jails under the emergency powers has expired, the State will no longer be permitted to pay the counties less than their costs for housing State prisoners. *Ibid.*

## II

The Disaster Control Act was enacted in 1941 to enable the Governor to assist the federal government during war emergencies, but amendments in 1942, 1949, and 1953 have since widened its scope. The broad purpose of the Act is

> to provide for the health, safety and welfare of the people of the State of New Jersey and to aid in the prevention of damage to and the destruction of property during any emergency as herein defined by prescribing a course of conduct for the civilian population of this State during such emergency and by centralizing control of all civilian activities having to do with such emergency under the Governor and for that purpose to give to the Governor control over such resources of the State Government and of each and every political subdivision thereof as may be necessary to cope with any condition that shall

arise out of such emergency and to invest the Governor with all other power convenient or necessary to effectuate such purpose.

[*N.J.S.A.* App.A:9–33.]

The Act empowers the Governor to "utilize and employ all the available resources of the State Government and of each and every political subdivision of this State * * * to avoid or protect against any emergency subject to the future payment of the reasonable value of such services and privately owned property as hereinafter in this act provided." *N.J.S.A.* App. A:9–34. The Act defines an "emergency" as including a "disaster." *N.J.S.A.* App.A:9–33.1(4). A "disaster" is

any unusual incident resulting from natural or unnatural causes which endangers the health, safety or resources of the residents of one or more municipalities of the State, and which is or may become too large in scope or unusual in type to be handled in its entirety by regular municipal operating services.

[*N.J.S.A.* App.A:9–33.1(1).]

*N.J.S.A.* App.A:9–45 sets forth the broad scope of the Governor's authority to issue emergency orders:

In order to accomplish the purposes of this act, the Governor is empowered to make such orders, rules and regulations as may be necessary adequately to meet the various problems presented by any emergency and from time to time to amend or rescind such orders, rules and regulations, including among others the following subjects:

* * *

i. On any matter that may be necessary to protect the health, safety and welfare of the people or that will aid in the prevention of loss to and destruction of property.

j. Such other matters whatsoever as are or may become necessary in the fair, impartial, stringent and comprehensive administration of this act.

Summarizing the foregoing legislative enactments in *Worthington v. Fauver*, 88 *N.J.* 183, 440 *A.*2d 1128 (1982), we said:

These sweeping provisions reveal three general pertinent features of the act. First, the act vests the Governor with broad powers to provide for the health, safety and welfare of the people of the State during any "emergency." *N.J.S.A.* App. A:9–33, –45. Second, these powers include the authority to centralize control over the resources of the State government and its subdivisions, including the counties, "whether of men, properties or instrumentalities." *N.J.S.A.* App.A:9–33, –34. Third, a significant purpose of the act is the prevention of harm to life and property. *N.J.S.A.* App.A:9–33, 45(i).

[*Id.* at 193–94, 440 *A.*2d 1128.]

In *Worthington,* we addressed the precise question before this Court today: whether prison overcrowding constitutes an "emergency" within the meaning of the Disaster Control Act, thereby authorizing the housing of State prisoners in county jails. In *Worthington,* Atlantic County sought to compel the Corrections Commissioner to accept custody of the State prisoners then housed in its county jail, alleging that the Commissioner's failure to accept such prisoners violated *N.J.S.A.* 2C:43–10 and *N.J.S.A.* 30:4–6.

After the action had been initiated, Governor Byrne, invoking his emergency powers pursuant to the Disaster Control Act, issued Executive Order No. 106 on June 19, 1981. In that Order he declared that prison overcrowding had created a "state of emergency * * * in the various State and County penal and correctional facilities." The Order stated that the Department of Corrections was "physically unable to accept from the Sheriffs of the various counties the custody of inmates sentenced" to the Commissioner's custody. Moreover, the Order stated that "these unusual conditions endanger the safety, welfare and resources of the residents of this State, and threaten loss to and destruction of property, and are too large in scope to be handled in their entirety by regular operating services of either counties or the New Jersey Department of Corrections."

Executive Order No. 106 authorized the Commissioner to house State prisoners in county jails and to redistribute such prisoners among the counties, and directed the Commissioner to create an "appropriate compensation program for the counties." According to its terms, the Order was a temporary measure to remain in effect for ninety days from the date of execution.

Commissioner Fauver thus asserted Executive Order No. 106 as an affirmative defense to Atlantic County's complaint. On September 4, 1981, a divided panel of the Appellate Division, to which the case had been transferred under *Rule* 1:1–2, upheld

the validity of the Order and the actions taken by the Commissioner as authorized in the Order. See *Worthington v. Fauver,* 180 *N.J.Super.* 368, 382, 434 *A.*2d 1134 (1981). On September 11, 1981, Governor Byrne issued Executive Order No. 108, which extended Executive Order No. 106 until January 20, 1982. Atlantic County appealed as of right to this Court because of the dissent in the Appellate Division.

Our analysis regarding the validity of Executive Order Nos. 106 and 108 was two-pronged: whether the then-existing prison overcrowding constituted an "emergency" within the meaning of the Disaster Control Act, and whether the Governor's exercise of his emergency powers was authorized by the Act. 88 *N.J.* at 192, 440 *A.*2d 1128. The latter prong involved two closely-related inquiries: whether the Executive Orders were rationally related to the legislative purpose of protecting the public, and whether the Executive Orders were closely tailored to the magnitude of the emergency. *Id.* at 197–98, 440 *A.*2d 1128.

We first considered Atlantic County's contention that the problem of prison overcrowding was not an "emergency" within the meaning of the Act because it was not an "unusual incident." Atlantic County had argued that prison overcrowding was not "unusual" because it had "been recognized as a major problem as early as 1977," and it was not an "incident" because it had not been a "sudden or unforeseen event." *Id.* at 194, 440 *A.*2d 1128.

We rejected that "overly narrow interpretation of the scope of the act," *ibid.*, because such a reading was inconsistent with the legislative purpose behind the Act:

> The Disaster Control Act must be understood in light of its purposes. It sought to protect the public by centralizing control over local government resources in situations whose remedies were beyond the authority and power of local government. A crisis can arise because of a failure to take action. Thus, it is not a necessary component of an "emergency" that it be sudden and unforeseen. * * * The question is not whether the incident emerged suddenly, but whether the scope of the present crisis prevents local governments from safeguarding the people, property and resources of the State.
>
> [*Id.* at 195, 440 *A.*2d 1128.]

Recognizing that prison overcrowding had reached "dangerous proportions" creating a potentially destructive situation and that only recently had the Legislature become aware of the extent of the overcrowding, we concluded that an "emergency" within the meaning of the Act existed. *Id.* at 196–97, 440 *A.*2d 1128.

We next concluded that "centralization of power to allocate prisoners among the various state and county facilities is a rational means of alleviating the problem of overcrowding in our prisons." *Id.* at 201, 440 *A.*2d 1128. Holding that the scope of power exercised by the Executive Orders had not exceeded the emergency, we stated:

> The Commissioner has only temporarily superseded the authority of the counties to refuse to hold state prisoners beyond 15 days. *We are particularly cognizant of the limited time span involved in these orders.* The original order was to be in effect for only 90 days. *As matters now stand, the order applies only until January 20, 1982. These time limits appropriately limit the exercise of executive power in light of the predictive nature of the emergency.*
>
> [*Id.* at 202, 440 A.2d 1128 (emphasis added) (footnote omitted).]

Lastly, we addressed the statutory validity of Executive Order No. 108, which had extended the original order for approximately an additional four months. As with the original Order we concluded that Executive Order No. 108 was valid. However, we offered the following caveat:

> If it chose to do so, the Legislature might well determine that permanent centralization of power to allocate state prisoners among county facilities would be an appropriate means of administering the penal system. It could pass a statute to that effect. However, we would hesitate to *infer* such a legislative intent from mere legislative inaction in the face of the continued exercise of emergency power by the Governor. Today we uphold the Governor's actions pursuant to *emergency* statutory authority. We believe, however, that the Disaster Control Act does not permit any delegation of power to the executive to permanently authorize the action taken. Rather it grants extraordinary power to the executive branch *in time of emergency* to protect the public. From this legitimate legislative purpose, we infer an obligation on the executive and legislative branches to seek legislative solutions to long-term problems such as prison overcrowding.
>
> [*Id.* at 203, 440 *A.*2d 1128.]

Emphasizing the limited time spans of the two Executive Orders, we commented that "we do not believe that the Legislature intended the Disaster Control Act to operate as a vehicle for a permanent wholesale takeover by the state of county penal facilities." *Id.* at 204, 440 *A.*2d 1128.

Finally, we left for another day the questions of "how often the Governor could renew Executive Order No. 106, or the length of time during which he could continue to exercise these extraordinary powers, before we would conclude that he had exceeded his statutory authority." *Id.* at 203–04, 440 *A.*2d 1128.

That day has come.

## III

Almost twelve years after its issuance, Executive Order No. 106, a "temporary" measure to combat prison overcrowding, remains in effect. Sixteen consecutive Executive Orders declaring a continuing "state of emergency" and extending all the previous Executive Orders back to Executive Order No. 106 have been issued under the administrations of Governors Byrne, Kean, and Florio. (Most recently, Governor Florio issued Executive Order No. 80 on January 15, 1993, extending Executive Order No. 52 and all of its predecessors until January 20, 1994, subject to the terms of any judicial order setting an earlier expiration date.) Once again we must determine whether the Governor's declaration of "emergency" pursuant to the Disaster Control Act is valid. *Cf. Burlington Food Store, Inc. v. Hoffman,* 45 *N.J.* 214, 220, 212 *A.*2d 29 (1965) (evaluating whether destructive price wars and unfair trade competition in milk-resale market created an "emergency"); *Jamouneau v. Harner,* 16 *N.J.* 500, 515, 109 *A.*2d 640 (1954) (determining whether acute housing shortage constituted "emergency"), *cert. denied,* 349 *U.S.* 904, 75 *S.Ct.* 580, 99 *L.Ed.* 1241 (1955); *Scatuorchio v. Jersey City Incinerator Auth.,* 14 *N.J.* 72, 85–86, 100 *A.*2d 869 (1953) (determining whether lack of

garbage- and refuse-disposal arrangements for Jersey City constituted "emergency").

Unquestionably, since Executive Order No. 106 was issued in 1981, inmate overcrowding has continued to be a pervasive problem throughout the State-prison and county-jail systems. As the Appellate Division pointed out, 256 *N.J.Super.* at 147, 606 *A.*2d 843, the total number of State prisoners increased approximately three-fold from 7,637 in June 1981 to 23,111 in July 1991. During that same period the number of State prisoners housed in county jails grew from 470 to 3,430, causing the county jails to operate at an average of 167% of capacity (using March 1990 figures), while State prison facilities operated at a projected 1991 average of 108.6% of capacity. *Ibid.; see County of Monmouth v. Department of Corrections,* 236 *N.J.Super.* 523, 566 *A.*2d 543 (App.Div.1989); *Morales v. County of Hudson,* 236 *N.J.Super.* 406, 566 *A.*2d 191 (App.Div.1989); Governor's Management Review Commission, *Corrections in New Jersey: Choosing the Future* (Oct. 19, 1990); Joint Appropriations Committee, *Analysis of the New Jersey Fiscal Year 1990–1991 Budget for the Department of Corrections* (Spring 1990); Harold A. Ackerman, *The New Jersey Jail Crisis: The Judicial Experience,* 44 *Rutgers L.Rev.* 135, 136–38, 150–63 (1991) [hereinafter Ackerman]. However, we can no longer say, as we did in *Worthington,* that current prison overcrowding constitutes an "emergency" within the meaning of the Disaster Control Act.

The determination of whether an "emergency" exists requires a fact-specific analysis. *See Deal Gardens, Inc. v. Board of Trustees,* 48 *N.J.* 492, 500, 226 *A.*2d 607 (1967). There is no temporal rule of thumb for determining when an "emergency" ceases to exist. Rather, courts should consider the passage of time, *see Hutton Park Gardens v. Town Council of W. Orange,* 68 *N.J.* 543, 566–67, 350 *A.*2d 1 (1975); *Cappture Realty Corp. v. Board of Adjustment,* 126 *N.J.Super.* 200, 213, 313 *A.*2d 624 (Law Div.1973), *aff'd,* 133 *N.J.Super.* 216, 221, 336

*A*.2d 30 (App.Div.1975), and other factors such as the extent to which the problem is within the government's control, *see Worthington, supra,* 88 *N.J.* at 195, 440 *A*.2d 1128; *Scatuorchio, supra,* 14 *N.J.* at 85–86, 100 *A*.2d 869, and the extent to which remedial efforts have been undertaken.

The causes of the current problem, doubtless many and complex, are beyond the scope of this opinion and indeed largely irrelevant to the precise issue before us. Hence, we need not evaluate the many legislative initiatives that led to longer prison terms and mandatory minimum sentences. According to Ackerman, *supra,* 44 *Rutgers L.Rev.* at 137 n. 8, those initiatives include (1) the New Jersey Code of Criminal Justice, with its generally lengthier sentences than previously provided under Title 2A of the Revised States; (2) the Parole Act of 1979, *N.J.S.A.* 30:4–123.45 to –123.69, which initially increased the terms of imprisonment for certain prisoners; (3) the Graves Act of 1982 and its later amendments, *N.J.S.A.* 2C:43–6c, setting minimum terms for those convicted of crimes involving firearms; (4) the capital-sentencing law of 1985, *N.J.S.A.* 2C:11–3b; (5) the Parole Violators Enhancement Act of 1986, *N.J.S.A.* 2C:44–5c, which required sentences for parole violations to be served consecutively to any new term imposed; and (6) the Comprehensive Drug Reform Act of 1987, *N.J.S.A.* 2C:35–1 to :36A–1, whose stated purpose is to "provide for the strict punishment, deterrence and incapacitation of the most culpable and dangerous drug offenders," *N.J.S.A.* 2C:35–1.1c. Nor need we balance those initiatives against the Legislature's efforts to deal with their inevitable results through allocation of funds to new construction of prison facilities and expansion of staff. (The State informs us in its brief that the budget of the Department of Corrections has grown faster than that of any other department in the Executive Branch over the past decade and is now approximately half a billion dollars; that the State system, while still unable to accommodate all those sentenced, has tripled its housing availability in the past ten years; and that there are four completely new prison facilities to house

adult male prisoners, increasing such adult facilities from three to seven during the decade.)

Despite the good-faith efforts thus far undertaken, however, the overcrowding problem has not been brought under control. The long-term problem of prison overcrowding calls for an executive and legislative solution rather than an executive order under the Disaster Control Act. *See Worthington, supra,* 88 *N.J.* at 203, 440 *A.*2d 1128. The Legislature is of course free to address the problem by declaring a continuing "emergency," and explicitly conferring on the Governor the authority to deal with it by Executive Order other than under the Disaster Control Act in its current form, *see, e.g., Burlington Food Store, Inc., supra,* 45 *N.J.* at 220–22, 212 *A.*2d 29 (finding continuing "emergency" pursuant to Milk Regulation Act of 1941, *L.*1941, *c.* 274, thereby upholding order by Director of Office of Milk Industry, Department of Agriculture), or by enacting a statute providing for the "permanent centralization of power to allocate state prisoners among county facilities," *Worthington, supra,* 88 *N.J.* at 203, 440 *A.*2d 1128, should it find that means an appropriate way to administer the penal system. But, as in *Worthington,* we remain unwilling "to infer such a legislative intent from mere legislative inaction in the face of the continued exercise of emergency power by the Governor." *Ibid.*

## IV

On the issue of reimbursement we are in agreement with the reasoning of *Shapiro, supra,* 193 *N.J.Super.* 237, 473 *A.*2d 112. So long as the "emergency" persists, the Commissioner is authorized to implement a per diem reimbursement rate that does not necessarily reflect the actual costs incurred by the counties. Of course, when the "emergency" ceases, so will the Commissioner's authority to set a discretionary rate for per diem reimbursement. Presumably the other branches will come to grips with the fiscal problem directly or confer on the

Commissioner the authority to address that problem, particularly the reimbursement rate.

## V

The Appellate Division declared that the State may no longer characterize the overcrowded conditions in the State's prisons as an "emergency" under the Disaster Control Act. 256 *N.J.Super.* at 152–53, 606 *A.*2d 843. Recognizing, however, that its action "[could] not be expected to cause an immediate change in a complex and expensive system of county and State correctional facilities," *id.* at 152, 606 *A.*2d 843, and that "[s]ome considerable period of time for compliance must be given," *ibid.*, the court below made its judgment effective as of one year from the date of its decision. For the same reason we will allow one year from today's date for compliance.

The judgment below is modified only in respect of its effective date, and, as modified, affirmed.

*For modification and affirmance*—Chief Justice WILENTZ and Justices HANDLER, CLIFFORD, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*For reversal*—None.