685 A.2d 1342

COUNTY OF MORRIS, PLAINTIFF–APPELLANT–CROSS–RESPON-
DENT, v. WILLIAM FAUVER, COMMISSIONER OF THE NEW
JERSEY DEPARTMENT OF CORRECTIONS, THE NEW JER-
SEY DEPARTMENT OF CORRECTIONS AND THE STATE OF
NEW JERSEY, DEFENDANTS–RESPONDENTS–CROSS–AP-
PELLANTS.

Superior Court of New Jersey
Appellate Division

Argued October 28, 1996—Decided December 17, 1996.

Before Judges PETRELLA, LANDAU and WALLACE.

*W. Randall Bush*, First Assistant Morris County Counsel, argued the cause for appellant-cross-respondent (*Ronald Kevitz*, Morris County Counsel, attorney; *Mr. Bush*, on the brief).

*Andrew R. Sapolnick*, Deputy Attorney General, argued the cause for respondents-cross-appellants (*Peter Verniero*, Attorney General, attorney; *Mary C. Jacobson*, Assistant Attorney General, of counsel; *Ronald L. Bollheimer*, Deputy Attorney General, of counsel; *Mr. Sapolnick*, on the brief).

The opinion of the court was delivered by

PETRELLA, P.J.A.D.

The County of Morris (County) entered into a forty-year contract with the State Department of Corrections (DOC) pursuant to the County Correctional Policy Act (the Act). The State provided funds to the County under the contract to upgrade and expand county correctional facilities. In return, the County agreed to house up to forty state prisoners per day in its facilities for the term of the contract. The eleventh paragraph of the contract provided payment provisions. Except for an initial period, the County was to be reimbursed at a rate equal to the average cost of housing state inmates at three state prisons.[1]

Based upon a letter from the Commissioner, the County submitted invoices to the State for reimbursement from 1985 to 1992 at a

---

[1] The record contains a Department of Corrections summary for prisoner housing for the fiscal years from 1985 through 1993. The average per capita cost for state prisoners at New Jersey, East Jersey, and Bayside in those years was:

| | | |
|---|---|---|
| 1985 — $36.87 | 1988 — $45.43 | 1991 — $53.13 |
| 1986 — $36.51 | 1989 — $48.26 | 1992 — $51.75 |
| 1987 — $42.74 | 1990 — $49.79 | 1993 — $56.87 |

In its brief the State asserts that "the uniform rate of compensation by the DOC initially was $42.95 in 1981; in 1985 was increased to $45.00; and in 1994 was increased to $58.40."

rate of $45 per inmate per day, mistakenly assuming that the figure was proper. After the County determined that the State was not reimbursing it commensurate with the average cost of the three state prisons, the County served a notice of claim under the New Jersey Contractual Liability Act, *N.J.S.A.* 59:13–1 *et seq.*, dated April 7, 1992, and thereafter instituted suit.[2]

On cross-motions for summary judgment, the motion judge concluded that neither party intended to breach the contract with regard to proper reimbursement. However, in so ruling, the judge found that the parties temporarily abandoned paragraph eleven. The judge then reinstated that provision for the remainder of the forty-year contract period.

I.

The facts may be succinctly stated. On May 11, 1983, Commissioner William Fauver (Commissioner) of the DOC, and the County entered into the Morris County Correctional Facilities Assistance Contract (the contract) pursuant to the County Correctional Policy Act, *N.J.S.A.* 30:8–16.3, *et seq.* (the Act), enacted in January 1982. The Act was designed to:

> establish[ ] in the Department of Corrections a long-term, financial assistance program to provide State grants to participating counties to renovate and construct county correctional facilities so that county correctional services may be developed, implemented, operated and improved.
>
> [*N.J.S.A.* 30:8–16.5(a).]

The Act generally permitted the State to arrange with counties to place state prisoners in county facilities.[3] Under these arrange-

---

[2] Apparently only the Commissioner was served. We attribute no controlling effect to the fact that the State was not served since the Commissioner acted in his official capacity as a State officer.

[3] Although the Act also provided for establishment of "county corrections advisory boards" by participating counties, *see N.J.S.A.* 30:8–16.7(a), there is no indication in the record when or if such a board was constituted in Morris County. Nor are we referred to any administrative regulations adopted by the

ments, the State would provide grants to upgrade county correctional facilities and reimburse the participating county at per diem rates for housing state prisoners.

The County agreed "to construct a 40 bed addition and make renovations to the county correctional facility located within" the County of Morris. The parties acknowledged in paragraph two of the contract that the State Legislature appropriated $2,156,676 to the DOC to assist the County in meeting its construction costs under the agreement.

The third paragraph of the contract recited the language of the Act that:

the Legislature has directed that the terms and conditions of said agreement should provide for the availability *and use* of a specific number of beds to be reserved for use by prisoners remanded by the State as well as per-diem rates favorable to the State in recognition of its contribution to the construction costs of the facility; . . . . (emphasis supplied).

Paragraph eleven of the contract sets forth the method for determining the per diem rate of reimbursement by the DOC to the County for the costs of housing state prisoners:

11. The Department shall pay the County a per-diem rate for housing of State prisoners in the 40 cells reserved for such prisoners in the county correctional facility. The rate shall be 75% of the average of the budgeted daily costs of housing state prisoners in the State prisons at Trenton, Rahway and Leesburg during that fiscal year. The 75 per cent per-diem rate shall remain in effect until such time as the total monies retained by the Department because of the discount equals $120,680.00.[4] Thereafter, the County shall continue to make available to the Department a total of 40 cells for use by State prisoners, but the per-diem rate shall be 100 percent of the average daily cost of housing State prisoners in the State prisons at Trenton, Rahway and Leesburg during that fiscal year. The County shall continue to make 40 cells available to the Department for use by State prisoners for the useful life of the facility, as set forth in N.J.S.A. 40A:2–22 (forty years). At the end of this period, the Commissioner and the County shall reassess

Commissioner under the Act to implement *N.J.S.A.* 30:8–16.7(b), 16.12. Our research discloses none.

4 Because there is no assertion that any rate other than the 100% per diem rate applies to 1988 and subsequent years, we presume the DOC has no claim under the discount provision and has retained the required sum.

the need for continued use of the 40 cells by the Department, and may negotiate a continuation of this agreement upon such terms as are deemed appropriate.

According to the Commissioner's answers to interrogatories, "[t]he County of Morris began to house state inmates pursuant to the MCCFAC [the contract] in Fiscal Year 1986, beginning with the period October 1, 1985, through December 31, 1985." Although the interrogatory answers asserted that at that time, "the average of the budgeted daily costs of housing state prisoners in the state prisons at Trenton [New Jersey State Prison], Rahway [East Jersey State Prison] and Leesburg [Bayside State Prison] ... for Fiscal Year 1986 was $36.51," a September 7, 1984 letter from the Commissioner to the sheriff's captain administering the county jail stated:

> Please be advised that the Department of Corrections has increased the per diem rate for housing State-sentenced inmates in the county facilities to $45.00 effective July 1, 1984. This rate will be paid through Fiscal Year 1985 to all counties who are housing State-sentenced inmates beyond the fifteen-day exclusionary period.

> In establishing the new per diem rate, I have taken into consideration the fact that State-sentenced inmates housed in county facilities will occasionally require medical treatment. Accordingly, medical expenses such as medication, both prescription and non-prescription, and any routine medical services provided by the county medical staff will not be considered for reimbursement.

The State contends that this letter concerned only those inmates housed in county facilities pursuant to the Disaster Control Act, *N.J.S.A.* App. A:9–30, *et seq.*, and the numerous executive orders issued thereunder,[5] rather than under the parties' contract. The letter is silent in this respect. Nothing in the letter would put the County on notice that the State was not complying with or did not intend to comply with the contract.

---

[5] *See Gloucester County v. State*, 132 *N.J.* 141, 623 *A.2d* 763 (1993), for a discussion of executive order No. 106 (1981), issued pursuant to the Disaster Control Act, *N.J.S.A.* App. A:9–30 *et seq.*, and the extensions of that executive order. The Legislature subsequently authorized successive two-year periods for the Governor to issue executive orders for the housing of state inmates in county facilities. *See L.* 1994, *c.* 12 and *L.* 1996, *c.* 9. However, there is nothing to indicate that any executive order was intended to or could negate existing contracts between the State and any county.

From the date the County began housing state prisoners in 1985 through September 1994, the County submitted to the State invoices at a per diem rate of $45 in reliance on the above letter, rather than requesting from the State any confirmation of the per diem rate pursuant to paragraph eleven of the contract. Neither the State nor the County ever questioned the propriety of this amount.

On April 7, 1992, by notice of claim pursuant to the New Jersey Contractual Liability Act, *N.J.S.A.* 59:13–1, *et seq.*, the County notified Commissioner Fauver of the DOC that it was in breach of the payment provisions of the contract. The notice recited that:

[t]he State has been paying the County at the rate of $45.00 per prisoner per day purportedly based on the State's average per diem rate. However, on October 23, 1989 William H. Fauver, Commissioner of the New Jersey Department of Corrections testified under oath in United States District Court Civil Action No. 82–1946 entitled "Camden County, et al. v. John J. Parker, Warden, et al." that the cost to house a state sentenced prisoner in the Trenton State facility was $63.00 per day. . . .

Furthermore, based upon information and belief, the present average cost to house a State prisoner is approximately $65.00 per day.

The notice concluded with a request for $2,604,000, representing the twenty-dollar difference between $65 and $45 for forty celled prisoners for 3,255 days claimed under the contract from May 11, 1983. Nevertheless, the County apparently continued to send invoices requesting reimbursement at the $45 per diem rate without qualification until January 1995.

The State refused to reimburse the County at the $65 rate or to acknowledge a breach of the contract. On October 14, 1992, the County filed suit against the State. On December 17, 1992, the Commissioner filed an answer admitting the existence of the contract, but denying its breach. After a period of discovery, the County moved for partial summary judgment, demanding $407,-879.97 for the "total differential of monies due and owing for FY 1988 thru 2nd Qtr FY 1993." The Commissioner cross-moved for summary judgment.

After oral argument, the motion judge, in a December 5, 1994 letter opinion, granted the Commissioner's cross-motion. The

judge's opinion noted that the terms of the contract were "not entirely clear and are somewhat ambiguous." Despite that premise, the judge found that both parties ignored the contract's payment scheme:

> It is clear that when Commissioner Fauver sent the letter of September 7, 1984 fixing a $45.00 per diem rate he simply was not adverting to the provisions of paragraph 11 of the contract. He was not in any way intending to breach the contract. He was routinely applying to Morris County a general statewide policy applying to State prisoners housed in county correctional facilities throughout the State. When the County submitted vouchers to the Department to cover all State prisoners held in the Morris County Correctional Facility during the years 1985 to 1992, and when all of those vouchers uniformly requested payment at the rate of $45.00 per day per prisoner, the County simply was not adverting to the provisions of paragraph 11. In short, from 1985 until 1992, both the Department and the County ignored the payment terms of paragraph 11 of the contract. Both parties fell into a practice upon which both relied in making their respective budgetary arrangements.

Nevertheless, the judge ordered that "[t]he contract will continue to be in force for 29 years into the future" and that the parties were to again abide by paragraph eleven.

After a telephone conference with the attorneys on January 5, 1995, the judge supplemented his letter opinion and ruled that the County's act of filing the complaint on October 14, 1992, rather than April 7, 1992 (the date of the notice of claim), constituted the formal manifestation of the County's intent to receive payment pursuant to paragraph eleven. The County was therefore deemed "not entitled to any payment in excess of $45.00 per day for any period covered by a voucher which was submitted prior to October 14, 1992."

The January 5, 1995 order stated that "Morris County shall be reimbursed pursuant to the provisions of paragraph 11 of the May 11, 1983 Morris County Correctional Facility Assistance Contract with revised rates effective from October 14, 1992"; and further "ordered that all vouchers for payment hereafter submitted by the County of Morris shall reflect the payment rate for prisoners for which the County believes itself legally entitled for the time period covered by the voucher."

Subsequently, the County submitted vouchers for reimbursement in the per diem amount of $58.50, with the notation: "This voucher is submitted w/o prejudice as to any future submittals for reimbursement pursuant to the January 5, 1995 decision" of the Law Division. This appeal and cross-appeal followed.

## II.

On appeal, the County argues that the motion judge erred in limiting its relief and asks this court to "order the State to reimburse Morris County pursuant to paragraph 11 of [the contract] from the date of January 1, 1988 throughout the term of said contract."

The Commissioner asserts that the motion judge, relying on *Mossberg v. Standard Oil Co. of N.J.*, 98 *N.J.Super.* 393, 406–407, 237 *A.*2d 508 (Law Div.1967), correctly found that both parties abandoned paragraph eleven, but argues in its cross-appeal that the judgment should be modified to reflect total abandonment of paragraph eleven. The Commissioner, however, does not suggest a payment plan to replace paragraph eleven. The Commissioner raises defenses of equitable estoppel, waiver, and laches in response to the County's argument in support of a breach of contract. He also asserts that the rate referred to in his September 7, 1994 letter to Morris County did not apply to contract prisoners, although we observe that nothing in the letter would reasonably inform the County of the State's position.

It appears that the motion judge attempted to equitably resolve the dispute summarily, and without taking testimony, by ruling that both parties temporarily abandoned paragraph eleven of the contract. Presumably the judge did so under the standard in *Brill v. Guardian Life Ins. Co. of America*, 142 *N.J.* 520, 666 *A.*2d 146 (1995). However, the only authority cited by the motion judge in support of his temporary partial abandonment ruling was *Mossberg, supra*, 98 *N.J.Super.* at 406–407, 237 *A.*2d 508, which does not furnish authority for his ruling on paragraph eleven. The plaintiff in *Mossberg* had entered into an employment con-

tract with his employer in 1937. Eight years later, a union collective bargaining agreement was executed, and although Mossberg was not a union member, his wages were fixed by the terms of the union agreement for over twenty years. In 1964 when the union went on strike, Mossberg sued to recover wages under his 1937 employment contract. The court found that the employment contract had been "virtually ignored and legally abandoned" by the parties for over twenty years, rendering it unenforceable in its entirety. *Id.* at 407, 237 *A.*2d 508. In so ruling, the court relied on contract abandonment principles: "A contract duly executed and thereafter abandoned or ignored by the contracting parties is unenforceable. Moreover, an abandonment may be inferred from the conduct of the parties and the attendant circumstances." *Ibid.* (citations omitted). More significantly, *Mossberg* cautioned that an intent to abandon a contract "must, however, be clearly expressed." *Ibid.* (citations omitted).

In the instant matter the parties did not completely ignore the contract and operate contrary to it or under the terms of a different agreement. The State advanced construction funds and the County housed state prisoners, all as contemplated. The County submitted vouchers in reliance on the only per diem rate ever given to it by the Commissioner. At most, the County was unaware that the State had itself not complied with paragraph eleven.

We are satisfied under the standards in *Brill v. Guardian Life Ins. Co. of America, supra,* 142 *N.J.* 520, 666 *A.*2d 146, *see R.* 2:10–5, that the County could reasonably rely on the actions of the Commissioner who had signed the contract and at all times proceeded thereunder as an agent of the State. Reasonable men could not differ in concluding that the County could reasonably rely on the Commissioner's representation of the per diem rate in the 1983 letter as applying to all state prisoners housed in the County's facility.

Nothing in the record warrants a conclusion that either party to the contract had clearly or implicitly rejected it. The parties

never abandoned the material portions of the contract that contained provisions for reimbursement to the County for the expansion of its facilities, restrictions on the type of state prisoners permitted to be housed in the County, the State's access to prisoners and records, and a requirement that the state prisoners engage in work under the County's supervision.

The motion judge tried creatively to avoid eliminating the reimbursement formula by constructing a limited abandonment theory that reinstated the original payment provisions of paragraph eleven. The court's reliance on *Mossberg* in support of extrapolation of a principle of partial abandonment is flawed. Abandonment is similar to the remedy of rescission and generally requires the undoing of the entire contract. *Merickel v. Erickson Stores Corp.*, 255 *Minn.* 12, 95 *N.W.*2d 303, 306 (1959); *see also Bonnco Petrol, Inc. v. Epstein*, 115 *N.J.* 599, 612, 560 *A.*2d 655 (1989) ("As a general rule a contract is not to be partially rescinded. It is true, however, that a severable transaction may be partially rescinded."). No party seeks that result, although the State's argument would effectively accomplish that with respect to calculating reimbursement under the contract. A limited or partial abandonment of a contract is in essence a modification which requires clear and convincing evidence of mutual assent. *Merickel v. Erickson Stores Corp., supra* (95 *N.W.*2d at 306).

It is true that a contract may be modified without the parties' express mutual assent. *Bankoff v. Wycoff*, 233 *F.*2d 476, 478 (10th Cir.1956). Modification may be implied from the acts and circumstances of the parties. "An agreement to change the terms of a contract may be shown by the conduct of the parties, as well as by an explicit agreement to modify." *Matanuska Valley Farmers Cooperating Ass'n v. Monaghan*, 188 *F.*2d 906, 909 (9th Cir.1951).

Such modification must be based upon new consideration. *Ross v. Orr*, 3 *N.J.* 277, 282, 69 *A.*2d 730 (1949) ("[T]he terms of a written contract may be altered or changed by a subsequent

agreement if based on a proper consideration."). The State argues that, when the County initially submitted the $45 vouchers, that sum was greater than the computation under paragraph eleven for the first few years of the contract and represents new consideration. Albeit nothing in the record indicates the County was aware of this fact, the State asserts that an "implicit agreement" was created which modified the original contract.

We reject that argument. Here, modification is not appropriate because there is nothing to indicate any clear and convincing proof that the County was aware the term of the contract had been modified. The State did not reject the County's vouchers and did not inform the county the rate was inappropriate. The Commissioner submitted a rate upon which the County could reasonably rely. It may be said that the County was misled. At best the contract might be said to be voidable. *See Marcangelo v. Boardwalk Regency Corp.*, 847 *F.Supp.* 1222, 1230 (D.N.J. 1994); *Restatement 2d Contracts* §§ 7, 376, 384 (1981). The victim of a misrepresentation has a choice of either rescinding or affirming the contract. *Id.* If he rescinds, the monies received under the contract must be returned but restitution is available. *Merchants Indem. Corp. v. Eggleston*, 37 *N.J.* 114, 130, 179 *A.*2d 505 (1962). Rescission is only available, however, in cases where the parties can be returned to their original positions. *Intertech Associates, Inc. v. City of Paterson*, 255 *N.J.Super.* 52, 59, 604 *A.*2d 628 (App.Div.1992). This is not possible here because the County has already received the funds to upgrade its facilities and done so, and has also housed numerous state prisoners.

If the victim of misrepresentation chooses to affirm the contract, damages are recoverable to make him whole. *Correa v. Maggiore*, 196 *N.J.Super.* 273, 286, 482 *A.*2d 192 (App.Div.1984). In calculating damages, a court should try to "put a plaintiff in as good a position as he would have been had the defendant kept his contract." *Lieberman v. Employers Ins. of Wausau*, 84 *N.J.* 325, 341, 419 *A.*2d 417 (1980) (quoting *Giumarra v. Harrington Heights*, 33 *N.J.Super.* 178, 196, 109 *A.*2d 695 (App.Div.1954),

*aff'd. o.b.,* 18 *N.J.* 548, 114 *A.*2d 720 (1955)). Under this scenario, the County should receive the difference between what it has received and what it should have received under paragraph eleven.

▇ Damages may be limited temporally. The doctrine of *nullum tempus* is no longer applicable to contractual claims made by the government. *N.J. Educ. Facilities Auth. v. Gruzen Partnership,* 125 *N.J.* 66, 76, 592 *A.*2d 559 (1991). Governmental entities must adhere to appropriate statutes of limitations. *Ibid.*

The Commissioner argues that assuming he breached the contract, the County's claim is barred by the Contractual Liability Act (*N.J.S.A.* 59:13–1 to –10). Under this Act, a party that has contracted with the State and claims that the State has breached the contract must submit to the State a notice of claim for a breach of contract within ninety days of the accrual of the claim. *N.J.S.A.* 59:13–5. Failure to do so within ninety days results in a permanent bar from recovery against the State. *N.J.S.A.* 59:13–5(a). After the ninety days, the claim will be forever barred unless the claimant files suit within two years of the claim's accrual or within one year after completion of the contract giving rise to the claim. *N.J.S.A.* 59:13–5(b).

▇ Of course, statute of limitations are subject to the "discovery rule." *Gantes v. Kason Corp.,* 145 *N.J.* 478, 487, 679 *A.*2d 106 (1996). The discovery rule is founded in equitable principles designed to mitigate unjust results that sometimes arise from strict adherence to a statute of limitations. *O'Keeffe v. Snyder,* 83 *N.J.* 478, 491, 416 *A.*2d 862 (1980); *Lopez v. Swyer,* 62 *N.J.* 267, 273–274, 300 *A.*2d 563 (1973). The rule provides that a cause of action does not accrue until either the injured party discovers or should have reasonably discovered the facts which underlie the basis for the action. *O'Keeffe, supra,* 83 *N.J.* at 491, 416 *A.*2d 862; *Burd v. New Jersey Telephone Co.,* 76 *N.J.* 284, 291–292, 386 *A.*2d 1310 (1978).

The record indicates that the County only became aware of a potential breach in 1992. Thereafter, the County filed its notice of claim on April 7, 1992. Although a new cause of action arose with each payment, *Metromedia Co. v. Hartz Mount. Assoc.*, 139 *N.J.* 532, 535–536, 655 *A.*2d 1379 (1995), there was a continuing breach, and the County is not here limited to only the ninety-day period before its notice under *N.J.S.A.* 59:13–5 because nothing indicates that the County knew or should have known of the State's prior disregard of the contract and its breach of the contractual provision. It would be a harsh and unfair result to hold that the State could participate in a contractual arrangement and reap a windfall due to its noncompliance with the terms of the agreement when it was the only party privy to the true facts. The State must be fair in its contractual duties, and may even be said to have a greater responsibility in that regard, particularly due to its superior bargaining position and obligation to act both legally and ethically. As our Supreme Court has said with respect to the State and its contractual responsibility: "government must 'turn square corners' rather than exploit litigational or bargaining advantages that might otherwise be available to private citizens." *W.V. Pangborne & Co. v. N.J. DOT*, 116 *N.J.* 543, 561, 562 *A.*2d 222 (1989). The government must act fairly and "with compunction and integrity." *Id.* at 562, 562 *A.*2d 222 (quoting *F.M.C. Stores Co. v. Borough of Morris Plains*, 100 *N.J.* 418, 427, 495 *A.*2d 1313 (1985)). We see no reason to make a distinction because the County is also a public entity, and even a subdivision of the State. Fair dealing should still be uppermost. *See Van Gemert v. Boeing Co.*, 520 *F.*2d 1373 (2d Cir.), *cert. denied*, 423 *U.S.* 947, 96 *S.Ct.* 364, 46 *L.Ed.*2d 282 (1975); *New Brunswick Savings Bank v. Markowski*, 123 *N.J.* 402, 423–426, 587 *A.*2d 1265 (1991); *Rudbart v. North Jersey District Water Supply Commission*, 127 *N.J.* 344, 379–380, 605 *A.*2d 681 (1992) (concurring opinion).

A factual determination must be made to calculate the number of state prisoners housed in the Morris County prison pursuant to

the contract from May 11, 1983, the date claimed in the County's complaint, and when the $120,680 threshold amount was reached.

The Commissioner contends that state prisoners have been housed both under the terms of the contract and pursuant to the Disaster Control Act and the executive orders issued thereunder. Moreover, he argues that the DOC "removed all inmates from the County facility as of June 30, 1993 that were housed there pursuant to the Contract. Thereafter, the Department of Corrections has not placed any state inmates in Morris County's correctional facility." The County argues that the Commissioner draws this distinction only to avoid paying the appropriate amount owed it under the terms of the contract. The County contends state prisoners are still housed in its facilities. The motion judge's only remark on this issue is found in his letter opinion:

> During many of the years thus far covered by the contract, the Department has also purported to exercise the right to have State prisoners in county correctional facilities without the consent of the counties involved pursuant to executive orders issued by the Governor of New Jersey.

This factual dispute must be resolved.

We reject the State's argument on its cross-appeal. Courts should not lightly set aside contracts, particularly between government entities. *See Driver v. Smith,* 89 *N.J. Eq.* 339, 359, 104 *A.* 717 (Ch.1918). *Cf. U.S. Const.* art. I § 10, cl. 1. There is no basis for the State to negate the terms of the contract or conclude there was an abandonment. Moreover, waiver, estoppel, and laches are not favored when sought to be applied against public entities. *O'Malley v. Dep't of Energy,* 109 *N.J.* 309, 316, 537 *A.*2d 647 (1987); *Township of Fairfield v. Likanchuk's, Inc.,* 274 *N.J.Super.* 320, 331, 644 *A.*2d 120 (App.Div.1994). The Act and the contract [6] contemplate that the State will use the County facility constructed with state funds to house forty state prisoners for the forty-year term of the contract. Thus, notwithstanding

---

[6] See particularly paragraph three of the contract, quoted *supra* at page 31, 685 *A.*2d at page 1345.

any emergency orders,[7] the contract remains viable and the State is contractually bound to pay for up to forty of its prisoners housed in the Morris County jail under the terms of the contract.

We reverse and remand for calculation of damages owed to the County from the date State prisoners were first housed by the County under the terms of the contract. The cross-appeal is dismissed.

---

7 The emergency orders were declared no longer effective as of April 22, 1994, in *Gloucester County v. State,* 132 *N.J.* 141, 143, 623 A.2d 763 (1993). *See also* footnote 4, *supra.*