658 So.2d 786 (1995)
CITY OF SHREVEPORT, Plaintiff-Appellee,
v.
CADDO PARISH, et al., Defendant-Appellant.
No. 27519-CA.
Court of Appeal of Louisiana, Second Circuit.
June 23, 1995.
Rehearing Denied August 17, 1995.
*788 Edwin L. Blewer, Jr., James Sterritt, Dannye W. Malone, James M. Woods, Shreveport, for appellant.
Jerry Jones, Lydia M. Rhodes, Shreveport, for appellee.
T. Allen Usry, John F. Weeks, II, Metarie, amicus curiae.
Before LINDSAY, HIGHTOWER and BROWN, JJ.
LINDSAY, Judge.
This appeal addresses the issue of which public entity is responsible for the cost of housing felony pretrial detainees in the Shreveport city jail. The City of Shreveport sought a declaratory judgment specifying that it was entitled to reimbursement for all costs incurred in housing such detainees in the city jail. The trial court ruled in favor of the City, finding the Caddo Parish Sheriff and Caddo Parish Law Enforcement District primarily liable and the Caddo Parish Commission secondarily liable. The Caddo Parish Sheriff and Caddo Parish Law Enforcement District appeal from the trial court judgment, as does the Caddo Parish Commission. For the reasons assigned below, we affirm in part, reverse in part, and amend in part the judgment of the trial court.

FACTUAL BACKGROUND
Prior to 1982, Caddo Correctional Institute (CCI) was the penal farm for Caddo Parish where parish prisoners served their sentences. Located near Keithville, Louisiana, the facility was operated solely by the Caddo Parish Commission[1] without any participation by the Caddo Parish sheriff. The Commission funded CCI through dedicated jail tax millages.
When Donald Hathaway was elected sheriff of Caddo Parish in 1979, the sheriff was only responsible for running the parish jail located in the Caddo Parish Courthouse ("the courthouse jail"), which was basically a holding facility. After 48 hours, prisoners had to be removed to CCI. This facility was funded from the Sheriff's general fund, and the Sheriff received a statutory per diem per prisoner of $3.50 from the Commission. See LSA-R.S. 33:1432(1).
Due to CCI's history of escapes and internal violence among the inmates, the Commission requested that the Sheriff assume the additional responsibility of operating that facility. In 1982, Sheriff Hathaway agreed to manage CCI, which he renamed Caddo Detention Center (CDC).
*789 Pursuant to their agreement, the Sheriff and the Commission entered into a written contract which established the funding for CDC; fundamentally, the Commission agreed to transfer to the Sheriff the balance of the funds generated by the millages previously used to operate the penal farm while retaining some funds for maintenance of the facility. Thereafter, the Sheriff had two budgets: his general fund for the Sheriff's office (also referred to as the Law Enforcement District) which operated on a fiscal year from July 1 to June 30, and the CDC budget which, like the Commission budget, operated on a calendar year basis. Due to the contract between the Sheriff and the Commission which provided for funding CDC through the millages, the Commission did not pay the statutory per diem of $3.50 to the Sheriff for the parish prisoners at CDC.
The contract provided that it would remain in effect until December 31, 1985, the expiration date of the 4 mill jail tax assessed for operation and maintenance of the facility. The Sheriff and the Commission initially hoped to replace that jail tax, which had been established in the Commission's name, with a similar jail tax in the Sheriff's name, which would allow the funds to come directly to the Sheriff's office. However, that effort was defeated at the polls. Eventually, the already existing jail tax was renewed by the voters of Caddo Parish. As a result, the funds for CDC continued to be channeled through the Commission.
Another relevant provision of the 1982 contract stated that the Sheriff would receive reimbursement from the state Department of Corrections (DOC) for the care of state prisoners. In addition to prisoners awaiting trial on felony charges ("felony pretrial detainees") and sentenced parish prisoners, CDC also housed state prisoners convicted on felony charges who had been given hard labor sentences and were awaiting transfer to a DOC prison. Following conviction, the DOC becomes financially responsible for housing these DOC prisoners and pays a per diem of $21.00 per prisoner to the parish facility where they are incarcerated pending transfer. See LSA-R.S. 15:824(B)(1)(a).
During the mid to late 1980's, crime across the nation dramatically increased, causing widespread jail overcrowding. On a state level, the DOC was unable to accommodate the large number of convicted felons committed to its custody, causing these DOC prisoners to back up in the parish jails. Locally, in order to make more room in jail for the more serious and violent criminals, the Caddo district judges began giving the parish prisoners sentences which involved the performance of community service instead of jail time. A consequence of this was to reduce the number of convicted parish prisoners available to serve as trustees at CDC.[2] Therefore, an increasing number of the DOC prisoners backed up in the Caddo Parish jail system were used as trustees.
The jail overcrowding resulted in serious local problems, not only in the parish jails, but also in the Shreveport city jail. This facility was essentially a misdemeanor jail where persons convicted in city court served their sentences; additionally, the city housed some federal prisoners. When the Shreveport Police Department makes felony arrests, these persons are initially booked into the city jail for processing; within 72 hours they are taken before a Caddo district judge for "jail clearance" at the Caddo Parish Courthouse, as required by LSA-C.Cr.P. Art. 230.1. Under ordinary circumstances, following jail clearance, these felony pretrial detainees are to be placed in the parish jail system and housed at CDC or in the courthouse jail. However, due to overcrowding at these facilities, the Sheriff's office began returning some of the felony pretrial detainees to the city jail, where they remained until bed space could be found in a parish jail facility.
An important factor in determining available bed space in the jails in Caddo/Shreveport is the restrictions placed on them by *790 federal consent decrees which govern jail conditions and the number of inmates. Pretrial prisoners must be separated from those who have been sentenced. The maximum number of prisoners that may be held in the parish jails is 514 at CDC (with a security staff of 98). Although the consent decrees allow 66 inmates to be held in the courthouse jail, reconfiguration of the cell blocks to provide for holding cells for prisoners waiting to attend court proceedings has reduced that number to 50. The Shreveport city jail is allowed to house up to 125 male inmates, with flexibility to go up to 135 for a 24-hour period; if the number of prisoners has not been reduced at the end of the 24-hour period, the city jail must close its doors to new prisoners. Also, pursuant to an agreement between the City and the Sheriff which was designed to allow the city jail to use its space more effectively, all female prisoners are housed in parish facilities.
In 1988, the City began receiving the $3.50 statutory per diem for the felony pretrial detainees it was housing. This was accomplished by billing the Sheriff's office. In turn, the Sheriff's office added the number of felony pretrial detainees held in the city jail to the number it held in the courthouse jail and submitted the combined figure to the Commission for payment of the statutory per diem. The Commission paid the Sheriff, which paid the city's bill for housing felony pretrial detainees.
Beginning in the late 1980's, the City attempted to negotiate a contract with the Commission whereby it would receive more than the statutory per diem. However, these efforts were rebuffed and no agreement was signed. In February 1992, the City demanded $25.00 per day per felony pretrial detainee. At this point, Sheriff Hathaway removed himself as the conduit for the payments to the City and passed on the request to the Commission, which refused to pay the increased per diem.

PROCEDURAL BACKGROUND
In March 1992, the City filed a petition for declaratory judgment against the Caddo Parish Commission. It sought a declaratory judgment defining the duties of the City and the Commission under LSA-R.S. 15:304 and LSA-R.S. 33:4715. It also sought to recover the costs of housing the felony pretrial detainees at the rate of $25.00 per prisoner per day.
The Commission made a third-party demand against Caddo Parish Sheriff Don Hathaway and the Caddo Parish Law Enforcement District, seeking indemnity from them. The City then amended its petition to add the Sheriff and the Law Enforcement District as defendants.
The Sheriff and Law Enforcement District answered and asserted immunity under LSA-R.S. 9:2798.1. They also filed a cross-claim against the Commission, contending that the Commission was financially responsible for the establishment, maintenance and operation the jail, as well as all expenses associated with housing felony pretrial detainees.
Trial began in May 1994. The trial court rendered judgment in favor of the City, making 35 specific findings of fact and/or law. For purposes of this appeal, the most important of these findings may be summarized as follows:
1. The Sheriff and the Commission have a joint obligation to reimburse the City for the cost of housing, feeding, medicating and transporting felony pretrial detainees. The Sheriff is primarily liable, while the Commission is secondarily and solidarily liable, at a rate of $24.00 per prisoner per day from the date suit was instituted.
2. The Sheriff voluntarily kept a number of DOC prisoners at CDC as "an economic decision for funding," not as a means to maintain a work force, requesting that a minimum of 125 DOC inmates be held in Caddo facilities. The Sheriff was ordered to reduce the DOC population at CDC to allow space for the felony pretrial detainees from the city jail and to maintain no more than 50 DOC prisoners on a regular basis.
3. On the issue of immunity under LSA-R.S. 9:2798.1, the action/inaction of the Sheriff and of the Commission concerning DOC inmates created the situation and was not within their lawful powers and *791 duties; however, if it was, their respective action/inaction was "willful, outrageous and reckless." Therefore, they are not entitled to immunity under the statute.
4. No financial agreement currently exists between the City, the Commission or the Sheriff as to housing the felony pretrial detainees. Also, the 1982 agreement regulating the payment made to the Sheriff by the Commission under LSA-R.S. 33:1432 expired by its own terms in 1985.
5. The Sheriff and the Commission failed to show that the City did not mitigate its damages.
6. There is no showing of necessity for the Sheriff to use the Law Enforcement District to generate revenues.
7. LSA-R.S. 15:824(B)(4) applies only if DOC prisoners are housed in the city jail.
8. The Commission failed to provide adequate jail space.
Judgment was signed on September 6, 1994. The trial court made a monetary award in favor of the City in the amount of $1,013,109.00.[3]
The Sheriff and the Law Enforcement District appealed from the trial court judgment. The Commission also appealed. In response, the City requested that the trial court judgment be affirmed.

FINANCIAL RESPONSIBILITY
The trial court held that the Sheriff and the Commission shared financial responsibility for the felony pretrial detainees, with the Sheriff bearing the primary obligation. In so concluding, the trial court reasoned that the felony pretrial detainees at the city jail were under the jurisdiction of the First Judicial District Court, of which the Sheriff is the executive officer. Therefore, the Sheriff was primarily liable for the costs of their housing. If the Sheriff was unable to pay, the Commission would be secondarily and solidarily responsible.
However, this conclusion is contrary to the relevant statutes and jurisprudence. LSA-R.S. 33:4715 mandates that, "The police jury of each parish shall provide a ... good and sufficient jail...." LSA-R.S. 15:702 further requires that, "The governing authority of each parish shall be responsible for the physical maintenance of all parish jails and prisons." [Emphasis added.]
In relevant part, LSA-R.S. 15:304 states:
All expenses incurred in the different parishes of the state or in the city of New Orleans by the arrest, confinement, and prosecution of persons accused or convicted of crimes, their removal to prison... shall be paid by the respective parishes in which the offense charged may have been committed or by the city of New Orleans, as the case may be. The expenses shall be paid by the parish treasurer or by the city of New Orleans after an account of the expenses shall be duly certified to be correct by the presiding judge and the clerk of court. The fees, salaries and expenses to be paid shall be fixed and regulated by the parish or city authority unless otherwise provided by law; ... [Emphasis added.]
The Sheriff's role is described in LSA-R.S. 15:704, which provides, in pertinent part, that "[e]ach sheriff shall be the keeper of the public jail of his parish." LSA-R.S. 15:705 mandates that the sheriff properly feed and cloth the prisoners.[4] The sheriff is paid a per diem by the parish for the cost of feeding and housing prisoners.[5]
*792 In Amiss v. Dumas, 411 So.2d 1137 (La. App. 1st Cir.1982), writ denied, 415 So.2d 940 (La.1982), the court reviewed the statutes referred to above and found that the governing body of the parish was "responsible for the expenses of establishing, maintaining and operating the jail and for all the expenses of feeding, clothing, and providing medical treatment to the prisoners while the sheriff has the duty of operating the jail and seeing to it that the prisoners are properly cared for, fed and clothed."
The court further stated, 411 So.2d at 1141:
These statutes, in effect, establish that prisoners incarcerated in the parish jail, either awaiting trial or serving parish sentences, are wards of the parish and the sheriff is simply the warden ("keeper") of the parish jail. (Emphasis theirs.)
While it is true that La.R.S. 15:705 requires that the sheriff feed each prisoner, La.R.S. 33:1432 fixes compensation to be paid to the sheriff by the parish governing authority for the feeding of the prisoners. The compensation paid to the sheriff covers only the cost of the food consumed by the prisoners. By the very act of fixing compensation to be paid to the sheriffs by the governing authority, the statute, in effect, recognizes that the ultimate responsibility for the expenses associated with feeding the prisoners rests with the governing authority and not with the sheriffs. We find no provision in any law which mandates that any of the duties required to be performed by the sheriffs are to be at their expense. There certainly would be no need for compensating the sheriffs for performance of these duties if they were to be at their expense in the first instance.
La.R.S. 15:702 places the responsibility for the physical maintenance of all parish jails and prisons upon the governing authority of each parish. No distinction is made therein between major and minor repairs, major and minor appliances, the general responsibility of the parish governing authority to maintain the prison and the supplies necessary for daily routine maintenance. This statute, along with La. R.S. 33:4715, which requires that the governing authority provide a "good and sufficient jail", mandates that the parish governing authority is responsible for establishing and maintaining the parish prison which includes all equipment and supplies necessary for the establishment and proper maintenance of the jail. [Emphasis added.]
See also Griffin v. Foti, 523 So.2d 935 (La.App. 4 Cir.1988) and Langley v. City of Monroe, 582 So.2d 367 (La.App. 2 Cir.1991).
Therefore, that portion of the trial court judgment holding the Sheriff primarily liable for the cost of housing felony pretrial detainees at the city jail must be reversed. The Commission alone is financially responsible for this expense, and judgment will be rendered accordingly.

DOC PRISONERS AT CDC
The trial court also found that the Sheriff had "requested" that a minimum of 125 DOC prisoners be held in Caddo facilities. It also found that the Sheriff voluntarily kept a number of DOC prisoners at CDC as "an economic decision for funding," not as a means to maintain a work force. The Commission attempts to use this finding of fact to distinguish the Amiss case, by contending that the court in that case was not faced with an overcrowding situation created solely by a sheriff who wrongly displaced felony pretrial detainees in favor of DOC prisoners who would generate more revenues.
The Sheriff and the Law Enforcement District maintain that these fact findings are not supported by the record. We agree. The evidence shows that the Sheriff only made one request to the DOC involving a specific number of DOC prisoners. In 1990, when the number of DOC inmates at CDC had risen to 238, he asked that the number of DOC inmates at CDC be limited to 160 at any given time; due to overcrowding in the state prison system, the request was denied. This request did not establish that the Sheriff desired to maintain 160 DOC prisoners at CDC; to the contrary, he was merely trying to reduce the number down to a maximum of that number.
*793 The City and the Commission both argue that had all or most of the DOC prisoners been removed from CDC, there would have been ample room for the felony pretrial detainees housed in the city jail. Unfortunately, this argument assumes that the removal of the DOC prisoners would occur in a vacuum. Even if these prisoners had been removed to DOC facilities or other parishes, they would have almost immediately been replaced as other felony pretrial detainees were convicted and sentenced, thereby becoming DOC prisoners. (For example, from January 1994 to July 1994, a total of 562 prisoners were sentenced by Caddo district judges to the DOC; in July 1994 alone, more than 100 prisoners were similarly sentenced.)
As demonstrated by Sheriff Hathaway's testimony, he recognized the harsh reality of the situation: due to the statewide DOC overcrowding, even if he could remove the DOC prisoners from CDC, their absence could not be sustained for any meaningful amount of time. Consequently, he endeavored to run CDC in a fiscally responsible manner. Knowing that the number of DOC prisoners in his facilities would remain high and that sentenced parish prisoners were less readily available to serve as trustees, DOC prisoners were used in this position as a means of making them "pay for themselves." By doing work that would otherwise have to be performed by paid civilian workers, about $1 million in salaries was saved. Generally, the number of this inmate work force fluctuated between 75 and 100.
Additionally, the per diem paid by the DOC for housing these prisoners amounted to revenue of about $1 million per year. In order to prepare the CDC budget, it was necessary to use a reliable figure of projected DOC revenues for housing these prisoners. The number of 125 was selected because the Sheriff felt certain that the state would not ordinarily be able to reduce the number of DOC prisoners below that level. The Sheriff testified that his policy was to move DOC prisoners as quickly as possible, while recognizing that his department budgeted for 125 DOC prisoners for income purposes and knowing from experience that the number would be maintained simply because sufficient bed space was not available in the state. However, had the DOC revenues fallen below that which was budgeted, the loss of those funds would have resulted in layoffs of security personnel at CDC with a corresponding loss of bed space or the necessity of the Commission making up the difference.[6]
The statistical data supports the Sheriff's position that he could not realistically go below 125 DOC prisoners and sustain a reduced number. In 1990, the average number of DOC prisoners was 220 per day; the lowest DOC population count was 166. In 1991, the average was 196, with a low of 150. In 1992, the average was 185; on three days, there were lows of 121, 124, and 125. In 1993, the average was 143; on 12 days, the number of DOC prisoners ranged from 114 to 125. For the first four months of 1994, the average was 134; on 16 days, the number was between 112 and 125.
The Commission contends that the Sheriff could have moved these DOC inmates to other parishes, pursuant to LSA-R.S. 15:706.[7] However, the record demonstrates that during this time period, the *794 Sheriff was already transferring large numbers of DOC inmates not only to DOC facilities, but also to other sheriffs throughout the state. In 1989, of the 568 DOC prisoners transferred, 459 went to DOC and 109 to other parishes. In 1990, 875 were transferred, with 493 to DOC and 382 to other parishes. In 1991, 852 were transferred, 395 to DOC and 457 to other parishes. In 1992, 855 DOC inmates were transferred, with 384 to DOC and 471 to other parishes. In 1993, a total of 1,046 were transferred, 153 to DOC and 819 to other parishes. In the first three months of 1994, 181 were transferred from CDC, with 47 to DOC and 134 to other parishes.
The Commission argues without factual support that even more bed space was available throughout the state. However, the testimony of the Sheriff and his staff demonstrates that they worked diligently to transfer as many prisoners as feasible as often as possible. While other parishes may have had additional bed space, it cannot be assumed that these other parishes would have automatically allowed the Caddo Parish Sheriff to commandeer this bed space for his DOC prisoners. To the contrary, many parishes prefer to maintain their jail space for their own prisoners, like Caddo Parish which does not accept such transfers from other parishes. Additionally, testimony at trial established that more than 7,000 DOC inmates were backed up in parish facilities throughout the state.
Based on the above, we find that the trial court was clearly wrong in finding that the Sheriff maintained these DOC inmates only as a revenue-generating device. Furthermore, we find that the Commission's attempt to distinguish the Amiss case on the basis that Sheriff Hathaway displaced felony pretrial detainees for profit must fail.
Accordingly, the portion of the trial court judgment finding that the Sheriff voluntarily kept the DOC prisoners for funding purposes must be reversed and vacated, along with that portion of the judgment ordering the Sheriff to maintain no more than 50 DOC inmates on a regular basis.

LAW ENFORCEMENT DISTRICTS
The Commission contends that the trial court erred in finding that there was no showing of necessity for the Sheriff to use the Law Enforcement District to generate revenues. To the contrary, it suggests that the Sheriff should be liable in the instant case because he has not fully used all of his own revenue raising and taxing authority to obtain additional revenues.
The law enforcement districts were created in 1976 to provide financing to the office of the sheriff in each parish. LSA-R.S. 33:9001, et seq. Previously, the sheriffs had been authorized to fund their offices through collection of commissions on the taxes they collected as ex-officio tax collector. LSA-R.S. 33:9003 established a basic millage for the law enforcement district, which was self-enacted by the statute. The statute also authorized additional millages and a sales tax if approved by the voters.
Over time the powers of the law enforcement districts have been expanded to grant the sheriff the ability to raise funds related to jails. In 1988, LSA-R.S. 33:1422 was amended to add the following section:
D. Notwithstanding the provisions of R.S. 33:4713, a sheriff and ex officio tax collector may purchase and equip such real property as is necessary in the performance of his duties, including but not limited to an adequate and safe jail. The ownership of such real property shall be vested in the parish law enforcement district. [Emphasis added.]
In 1989, LSA R.S. 33:9010 was amended to expand the law enforcement district's long-term borrowing powers to include the following provision:
D. (1)(a) Each district is authorized to issue revenue bonds in order to obtain funds to acquire, construct, reconstruct, renovate, improve, replace, maintain, repair, extend, enlarge, lease, as lessee or lessor, purchase, or equip such immovable or movable property, including but not limited to jails, administration or office buildings, maintenance, storage or utility facilities, or any other facility, building, structure, equipment, or furnishings which may be of use or benefit to the district or *795 to the applicable sheriff. [Emphasis added.]
However, these provisions are entirely discretionary. They are not mandatory, as are the obligations imposed upon the parish. While the sheriff may have the option of resorting to these fund-raising methods to secure funds for jailswith the approval of the votersthere is no mechanism in these statutes which requires him to do so.

MISUSE OF FUNDS
The Commission makes numerous allegations of misuse of funds by the Sheriff in connection with its claim for indemnification. However, we find that these matters are irrelevant to this appeal and do not merit detailed discussion. At any rate, our review of the record discloses that the allegations are without basis and that the Commission has not demonstrated any grounds justifying indemnification by the Sheriff.[8]

ADEQUATE JAIL SPACE
The Commission complains of the trial court's finding that it failed to provide adequate jail space. In support of this contention, it claims that the expert testimony it provided at trial disproved the trial court's finding that it had not furnished adequate jail space. We disagree.
The expert testimony relied upon by the Commission is the deposition and report of Robert Glotz, in which he expresses the opinion that the Caddo jails would have been sufficient to house all Caddo prisoners awaiting trial in this jurisdiction. However, an examination of Mr. Glotz's deposition reveals that he failed to consider such crucial information as Caddo's felony arrest rates or the number of persons who were released on bail pending trial. In view of the other evidence in the record, including the testimony of the ceaseless efforts of the courts and the Sheriff's office to reduce the jail population on a daily basis through release on bond or on recognizance, we find that such omissions significantly impair the value of Mr. Glotz's expert opinion.
It is clear that in recent years, the Commission has failed to provide adequate jail facilities. The trial court did not err in so finding.

AGREEMENTS BETWEEN THE PARTIES
The trial court found that no agreement currently existed between the City, the Commission or the Sheriff as to housing the felony pretrial detainees. The trial court also found that the 1982 agreement between the Sheriff and the Commission expired by its own terms in 1985.

A. Agreement with the City
The Commission argues that there was an agreement between the City and the Sheriff for the felony pretrial detainees to be housed at city jail. The Commission contends that it was not a party to such agreement, that the Sheriff did not act as its agent, and that it consequently cannot be held responsible for any payments to the City. However, the evidence (including minutes of Commission meetings) demonstrates that the Commission was fully aware of the situation concerning the housing of the felony pretrial detainees at the city jail and that the Sheriff acted as a go-between to facilitate payment because the Commission did not wish to pay the City directly. The Commission had the obligation of providing an adequate jail and bearing the financial burden of housing the parish prisoners; it therefore received a benefit from the City's action in housing the felony pretrial detainees. At a minimum, a quasi-contractual situation existed. See LSA-C.C. Art. 2292 and 2293. Therefore, the Commission is responsible to the City for the expenses of the felony pretrial detainees.[9]

*796 B. CDC contract between Sheriff and Commission
The Commission contends that its 1982 contract with the Sheriff for the operation of CDC had been tacitly and orally renewed since its expiration in 1985. The Commission argues that since this contract established alternative financing for the operation of CDC, i.e., the jail millages, it was absolved of additional financial responsibility in maintaining prisoners who were displaced from CDC by the Sheriff's actions.
The testimony of the Sheriff and the representatives of the Commission established that, even after the expiration of the contract in 1985, they continued to operate under its terms. While we agree that the contract was still in effect between these parties, we do not accept the assertion of the Commission that such a finding somehow relieves the Commission of its statutory financial obligations and its obligation for maintenance of felony pretrial detainees, particularly those housed in the city jail (inasmuch as they could not realistically be housed in parish facilities). The Commission must bear the ultimate cost of housing all parish prisoners, not only under the statutes discussed supra, but also under the terms of the contract between the Sheriff and the Commission. In the contract, the parties agreed that the Sheriff would operate CDC while the Commission would continue to finance the facility. While the Sheriff agreed to "make every effort" to operate the facility out of the funds designated in the contract, the agreement specified that if those funds proved to be inadequate, the Sheriff could request the necessary additional funds from the Commission.
Under the circumstances of this case, the existence or non-existence of a contract does not relieve the Commission of its financial obligations. This specification of error has no merit.

MITIGATION OF DAMAGES
The Commission contends that the City voluntarily accepted felony pretrial detainees and that the City was aware that it had the option of refusing to accept such detainees; consequently, the City failed to mitigate its damages. It also contends that the City further contributed to the problem by failing to increase its own jail space and by housing federal prisoners for profit. Thus, the Commission pleads estoppel against the City's claims.
The record reveals that the City tried diligently for many years to resolve the jail overcrowding situation in the city jail. In the words of former Mayor John Hussey, the City desired to be part of the solution, not the problem, and took the position that all of the parties were working together to fight crime in the Shreveport/Caddo area. Under his administration, the City tried to negotiate a contract with the Commission for a $7.00 per diem; however, a representative of the Commission testified that he never seriously intended to enter into such contract with the City. Both Mayor Hussey and his successor, Mayor Hazel Beard, contacted the DOC and requested that the number of DOC inmates in Caddo jails be reduced.
One action which the City consistently refused to take under both administrations was to irresponsibly release the felony pretrial detainees from the city jail back into the community. Although a representative of the Commission responded to the City's initial demand for a per diem of $25.00 per prisoner by advising the City to not house the felony pretrial detainees unless it was prepared to absorb the cost, he did not supply a constructive response to Mayor Beard's query as to what the City should do with the felony pretrial detainees.
At one point, the City attempted to increase its own jail space by the imposition of additional taxes; this tax issue was defeated at the polls. Although the city jail also housed federal prisoners at a profitable per diem of $29.00, this action was pursuant to a contract with the federal government whereby the federal government funded renovations to the city jail in exchange for the City holding up to 15 federal prisoners for the next 10 years.
Considering the totality of the circumstances, we cannot construe the actions of the City as a failure to mitigate its damages. This specification of error has no merit.

*797 APPLICATION OF LSA-R.S. 15:824(B)(4)
The Commission contends that the trial court erred in concluding that LSA-R.S. 15:824(B)(4) applies only if DOC prisoners are housed in the city jail. It argues that the City should have received the DOC per diem established in this statute instead of the Sheriff because the felony pretrial detainees had to be housed in the city jail as a result of DOC inmates preempting bed spaces at CDC. The Commission contends that had the City received the $21.00 per diem, most of the judgment, which awarded the City recovery of $24.00 per day per prisoner, would have "evaporated."
LSA R.S. 15:824 provides, in relevant part:
A. Notwithstanding any provision of law to the contrary, any individual subject to confinement in a state adult penal or correctional institution shall be committed to the Louisiana Department of Public Safety and Corrections....
* * * * * *
B. (1)(a) In the event any individual has been committed to the department for confinement which is or has been delayed or prevented after final sentence by court order restricting the department from institutionalizing the individual, or when the individual is not institutionalized in a state penal or corrections institution because of lack of facilities under the control of the department, or the department otherwise refused to accept the individual for confinement, which resulted or has resulted in the individual being confined in a parish jail or institution after final sentence, or when he is being held in the parish jail without bail, pending an appeal, the department shall pay to each parish sheriff, or to the governing authority of those parishes in which the governing authority operates the parish jail, for keeping and feeding the individual in the parish jail the sum of twenty-one dollars per day from date of sentencing until the individual is confined in a penal or correctional institution under the supervision of the department.
* * * * * *
(4) In the city of Shreveport, when the city jail holds prisoners for the sheriff of Caddo Parish, the increase in per diem provided for in Senate Bill No. 553 of the 1991 Regular Session [fn. 1] shall be paid to the governing authority of the city of Shreveport. [Emphasis added.]
A reading of the statute in its entirety demonstrates that the trial court's interpretation was correct. The statute authorizes payment for DOC prisoners, not payment for felony pretrial detainees. Therefore, this specification of error has no merit.

IMMUNITY UNDER LSA-R.S. 9:2798.1
Both the Sheriff and the Commission seek immunity for discretionary acts under LSA-R.S. 9:2798.1. The City responds that such immunity only applies in situations involving tort liability and is thus inapplicable in the present situation. We agree. LSA-R.S. 9:2798.1 applies only to offenses and quasi-offenses; this is demonstrated not only by its contents but also by its placement in the Civil Code Ancillaries.[10] The immunity from liability for discretionary acts granted to state governmental agencies by this statute is essentially the same as the immunity conferred on the federal government by the exception in the Federal Tort Claims Act. See Chaney v. National Railroad Passenger Corporation, 583 So.2d 926, 929 (La.App. 1 Cir.1991); Kniepp v. City of Shreveport, 609 So.2d 1163, 1166 (La.App. 2 Cir.1992), writ denied, 613 So.2d 976 (La.1993). The situation presented here, the City rendering services on behalf of the Commission and the Sheriff, cannot be construed as an offense or quasi-offense. To the contrary, it is properly characterized as a quasi-contractual matter arising under LSA-C.C.Art. 2293. Therefore, we find that neither the Commission nor the Sheriff are entitled to immunity under LSA-R.S. 9:2798.1.

*798 KEEPER OF THE NEW JAIL
The Commission also argues that the trial court erred in stating in dicta that the Sheriff is the keeper of the new jail. A new Caddo Parish jail opened in 1995 with a capacity of 1,070 beds, which will tend to relieve jail overcrowding. The general principles pertaining to the operation of jail facilities are set forth in the Amiss case and the statutes discussed, supra. However, the specific manner of operation of this facility is not properly before us for review. Therefore, we pretermit consideration of this specification of error.

FIXED COSTS
The Commission also contends that the trial court erred in allowing the City to recover the amount of $24.00 per day per prisoner because this amount included the fixed costs for running the city jail.
The parties stipulated that the cost to the City for housing the felony pretrial detainees in the city jail was $24.00 per day per prisoner, inclusive of salaries, administrative and overhead costs. This figure was based upon the total cost of operation and maintenance of the facility divided by the total number of all prisoners housed in the jail.
The Commission reserved its right to present arguments with respect to those costs directly related to prison population (food, clothing and medical care) as opposed to the City's fixed costs (jailer salaries and benefits, administrative costs and building overhead). During his testimony, Leonard Ross, the superintendent of the Shreveport city jail, discussed Exhibit # C-24. This document supplied a breakdown of the many components involved in determining the daily cost per prisoner. Among these categories are "consumables" (food) and "medical supplies." We are unable to determine which, if any, category includes clothing.
Although there are no Louisiana cases directly on point, we take note of County of Gloucester v. State of New Jersey, 256 N.J.Super. 143, 606 A.2d 843 (1992), modified, 132 N.J. 141, 623 A.2d 763 (1993). In that case, a county had filed suit to compel an increase in the per diem rate for State prisoners housed in county jails. The State prisoners were being housed in county jails under an emergency order, and the per diem was discretionary, and did not realistically address the actual costs being borne by the counties. The following discussion briefly refers to the fixed costs of the county jails, 606 A.2d at 848-849:
For instance, when Morris County urges that the Federal Marshall's computation which calculates prisoner per diem costs as the total jail budget divided by the total prisoner days, we note that such a simplistic approach does not provide a marginal economic analysis. Certainly, the addition of a single State prisoner would not require any fixed cost adjustment if there is bed space available for that prisoner. The cost of heating would remain the same, the warden would receive the same salary, and most probably no additional personnel would be necessary. As the number of State prisoners increases, expenses not immediately associated with an individual prisoner's care (food, clothing, bedding and the like) begin to appear incrementally. Additional guards, recreational equipment, staff services or even coordinate programs necessary to supervise displaced county jail inmates would have to be reassessed.... When the State adds prisoners to a county jail, it does not become necessarily responsible for a percentage of all jail expenses based upon a per capita prisoner ratio. The State may become responsible solely for the extra expenses foisted upon that county to house and provide services to the State prisoner. If the eventual solution to the county-State correction problem is legislatively or administratively resolved by the payment of the county's actual expenses, the State should be liable for no more than the actual costs it has imposed upon each county.
In the instant case, the City is not entitled to recover its fixed costs, which would be present even without the presence of the felony pretrial detainees. The City has run its own jail for many years; by necessity, mere operation of the facility for the City's own purposes has resulted in the City incurring a variety of fixed costs, including administrative salaries and utilities. The *799 City has a substantial backlog of several thousands of unexecuted warrants; this fact alone indicates strongly that the city jail would be full even if the parish were able to accept all felony pretrial detainees immediately after jail clearance.
There is no statutory authority for payment of the City's fixed jail costs. Such an issue would perhaps be best addressed by future legislation.
Although neither statutory provisions nor jurisprudence specifically address the manner of computing the amount due the City for the expenses of the felony pretrial detainees, by analogy, we look to LSA-R.S. 15:706. This statute provides for the transfer of prisoners between parishes; the sheriff receiving the prisoners is entitled to receive from the transferring parish the same compensation authorized by law for the keeping and feeding of prisoners. Application of that statute to the facts of the present case would restrict the City to recovery of an amount not less than the $3.50 per diem in LSA-R.S. 33:1432. This statute clearly refers to the compensation for daily expenses and not total fixed costs of the jail facility.
Here, the exhibits contained in the record show that, of the $24.00 daily cost for maintaining a prisoner in city jail, consumables constitute 15.6% or $3.74, while medical supplies constitute 1.9% or $0.46. We find that the City is entitled to recover the amount of these items, or $4.20 per prisoner per day.
We calculate the City's award as follows: 42,611 "man days" @ $4.20, or $178,966.20, subject to a credit of 455 female city prisoners @ $3.50, or $1,592.50, for a total of $177,373.70.[11]
The judgment will be amended accordingly.

CONCLUSION
The portion of the judgment of the trial court holding the Sheriff of Caddo Parish liable to the City of Shreveport is reversed. Judgment is rendered decreeing that the Caddo Parish Commission is the sole party answerable to the City of Shreveport for housing of the felony pretrial detainees in the city jail. Additionally, the portion of the trial court judgment limiting the number of DOC inmates to 50 is reversed.
All portions of the trial court judgment in conflict with these rulings are hereby reversed, including, specifically, the following numbered paragraphs in the trial court judgment: paragraphs 9, 12, 14, 21, 24, 26, 27, 29 and 32. We also reverse and set aside rulings of the trial court contained in: the last sentence of paragraph 6, the first sentence of paragraph 15, the last sentence of paragraph 20, the last sentence of paragraph 22, the last sentence of paragraph 25, and the last sentence of paragraph 30.
The judgment is amended to grant the City of Shreveport recovery against the Caddo Parish Commission in the amount of $178,966.20, subject to a credit for the housing of 455 female city prisoners in parish facilities at a per diem rate of $3.50, or $1,592.50, for a total of $177,373.70, with legal interest from date of judicial demand.
Issues concerning the new jail, discussed in paragraph 8, are pretermitted.
In all other respects, the judgment of the trial court is affirmed.
Costs, to the extent permitted by law, are to be borne equally by the Caddo Parish Commission and the City of Shreveport.
REVERSED IN PART, AFFIRMED IN PART, AMENDED AND RENDERED.
*800 APPLICATION FOR REHEARING
Before SEXTON, LINDSAY, HIGHTOWER, BROWN and WILLIAMS, JJ.
Rehearing denied.
NOTES
[1] In the early 1980's, the governing body of Caddo Parish was known as the Caddo Parish Police Jury; following the adoption of a home rule charter, its name was later changed to the Caddo Parish Commission. However, for the sake of consistency, we will refer to it as "the Commission" throughout this opinion.
[2] When Sheriff Hathaway assumed control of CDC, trustees were being used to perform such necessary tasks as laundry, kitchen work, maintenance, painting, and minor plumbing, in lieu of hiring civilian workers. Only a prisoner sentenced to a parish prison or a prisoner in a parish prison awaiting transfer to a state correctional facility may be used to perform manual labor. See LSA-R.S. 15:708.
[3] This sum represents payment at a rate of $24.00 per day for each felony pretrial prisoner housed in the city jail from the filing of suit in March, 1992, through July 30, 1994, or $1,022,664.00, subject to a credit of $21.00 per day per prisoner for each female misdemeanor prisoner held in a parish jail facility on behalf of the City, or $9,555.00.
[4] LSA-R.S. 15:705(A): "The sheriffs or jail keepers shall supply each prisoner daily with wholesome food sufficient in quantity for the proper maintenance of life. They shall provide the prisoners with clothing suited to and sufficient for the season."
[5] LSA-R.S. 33:1432: "The compensation, fees, and costs allowed sheriffs, the parish of Orleans excepted, for all services in criminal matters, shall be the following:

(1) For keeping and feeding of prisoners in jail not less than three dollars and fifty cents per diem for each prisoner. Any surplus funds remaining at the end of the fiscal year shall be returned to the parish governing authority."
[6] The Commission complains of the trial court's statement that it "indirectly" received the DOC revenues. However, it is apparent that the Commission indirectly received the benefit of these resources in the sense that it would have been required to make up the difference in the CDC budget had the funds not been received.
[7] LSA-R.S. 15:706:

A. (1) Whenever the jail of a parish is unsafe or unfit for the security of prisoners, or is held by judicial decree unfit for the detention of some or all of the inmates, or presents a security risk to a prisoner or other prisoners or to the public, or whenever a particular prisoner presents a security or health risk to himself or to other prisoners or to the public, the sheriff of the parish maintaining and keeping the prisoner or prisoners may transfer any prisoner or prisoners to the jail or jails of any other parish by written contract with the sheriff of the other parish.
* * * * * *
B. The sheriff to whom the transfer of the prisoner or prisoners is made shall receive, for the maintenance of such prisoner or prisoners, the same compensation authorized by law for the keeping and feeding of prisoners, which shall be paid by the parish transferring the prisoner or prisoners.
[8] For example, the Commission alleges that the Sheriff improperly placed the following expenses in the CDC budget: training for new CDC deputies; salaries for transportation officers and probation and parole officers; and legal expenses for the present law suit. We find no support in this record for the contention that such actions constituted a misuse of funds.
[9] While we find that there was a quasi-contract for the expenses of the felony pretrial detainees, we are not persuaded that this quasi-contractual obligation extends to the fixed expenses of the city jail, as discussed in this opinion, infra.
[10] LSA-R.S. 9:2798.1 is in Title 9, Code Book III, Code Title V, Chapter 2, Of Offenses and Quasi Offenses.
[11] Like the trial court we believe that it is appropriate to give the Commission a credit for the female prisoners who were housed in parish facilities pursuant to the agreement between the Sheriff and the City. The record indicates that the City was not charged by the Sheriff or the Commission for the housing of these female prisoners; apparently, they were included in the prisoners for whom the Commission paid the $3.50 per diem. The trial court's credit of a $21.00 per diem for these female prisoners has no statutory basis and must therefore be reversed and set aside. However, we will credit the Parish with the cost of their housing at the rate of $3.50 per female prisoner per day. Again, see and compare LSA-R.S. 15:706 and LSA-R.S. 33:1432.